LOLLEY, J.
11 This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana, whereby a jury convicted the defendant, Marcus Andrew Taylor, of manslaughter, a violation a La. R.S. 14:31. After the trial court denied Taylor’s motion to reconsider, he was sentenced to serve 30 years at hard labor. Taylor now appeals, and for the following reasons, we affirm his conviction and sentence.
Facts
On September 11, 2008, 18-year old Ta-via Sills was reported missing by her mother, Vicki Britton. Two days earlier, Sills had left home with her ex-boyfriend and the alleged father of her unborn child, LaMondre Tucker. Sills informed her mother that Tucker was taking her to meet his sister. Some time after the pair left, Tucker strangely returned to Sills’ home and told Britton that he had dropped Sills off at her sister’s apartment complex. Unfortunately, Sills never came home.
On September 12, 2008, Mokojo Hill and her husband, Columbus, went fishing at a small pond near Legardy Street in Shreveport, Louisiana. However, upon arriving at the pond, Mokojo viewed what she believed to be a body floating in the water. After Columbus confirmed her fears, the couple immediately left the pond and telephoned police. The badly decomposed body was identified as Tavia Sills. Sills was five months pregnant at the time of her death, and Tucker immediately became the lead suspect in Sills’ disappearance.
. After police confronted Tucker with surveillance video from Sills’ sister’s apartment complex revealing that Tucker never dropped Sills off, |2Tucker confessed to police that he had murdered Sills and that the defendant, Marcus Taylor, was with him during the commission of the crime.[1]
As a result of Tucker’s confession, Detective Rod Demery of the Shreveport Police Department contacted Taylor, who agreed to an interview. Upon speaking with Detective Demery, Taylor denied any involvement in the crime. However, in subsequent interviews with police, Taylor changed his story and admitted assisting Tucker in the murder.
Taylor was charged by amended indictment with second degree murder on May 5, 2010. Shortly thereafter, Taylor filed two motions to suppress evidence: a buccal swab seized on September 15, 2008, and his statements made to police on September 15, 17, and 18 of 2008. In particular, Taylor argued that the police failed to obtain a search warrant for the buccal swab. As to his statements made to police, Taylor maintained they were not voluntarily and intelligently made because he is mentally retarded and lacked the ability to understand and waive his Miranda rights.
In response to the motions, the state filed a motion requesting a mental examination of Taylor to determine his mental capacity to proceed to trial. The trial court granted the state’s motion, and Drs. George Seiden and Marc Colon were appointed to examine Taylor.
A sanity committee hearing was held, and Dr. Seiden, a forensic psychiatrist, testified as to his July 13, 2010, examination of Taylor. Dr. Seiden reviewed the *967 following documents prior to his examination: (1) IgTaylor’s offense reports; (2) Taylor’s school records; (3) interviews with Taylor’s former teacher, his mother (Robin Taylor), and his girlfriend (Luwan-da Walker); (4) Dr. James Pinkston’s report; (5) an affidavit by Dr. Mark Dulle; (6) Taylor’s social security records; and (7) a report by Dr. Victoria Swanson. The records revealed that Taylor had been in special education classes in school and had been previously found by Dr. Mark Dulle as having an IQ of 56. Taylor had not been able to hold a job, had a supportive home life, and had a girlfriend and two children. Dr. Seiden concluded that Taylor suffered from mild to moderate mental retardation and that his IQ was at the lower end of the classification for mild retardation.
Utilizing the factors set forth in State v. Bennett, 345 So.2d 1129, 1138 (La.1977), Dr. Seiden determined that Taylor lacked the capacity to stand trial. Specifically, while Taylor understood the nature of the charge against him, murder, and the role of his attorney, he did not know how his attorney was to assist him at trial. Taylor also mistakenly thought that Sister Kathy Broussard, a mitigation specialist with his defense team, was his attorney. Additionally, while he understood the penalty he faced if convicted, Taylor could not articulate the meaning of the terms “jury” or “plea bargain.” Nor could he define the word “witness,” although he knew what “testifying” meant. Dr. Seiden opined that Taylor did not have the capacity to proceed to trial because although he understood the charges against him, his knowledge of certain specific details of the proceedings was lacking, and therefore he would have difficulty interacting effectively 14with the attorney and following the proceedings effectively. Dr. Seiden also believed that Taylor would have difficulty concentrating during the trial due to its complex nature, and his confusion would be exacerbated by the fact that Taylor’s criminal responsibility related to his actions as a principal to Tucker’s crime.
On cross-examination, Dr. Seiden conceded that Taylor could be taught about his right to testify. Additionally, Dr. Seiden found that Taylor was not suffering any significant memory deficit that would interfere with his ability to remember the facts relating to the crime. In fact, Dr. Seiden noted that Taylor possessed the ability to inform his attorney about possible witnesses to assist in his defense, and with some difficulty, Taylor could also maintain a consistent defense and testify on his own behalf. Moreover, Dr. Seiden explained that Taylor’s mental retardation was a static condition, unlikely to deteriorate under the stress of trial. Despite these findings, Dr. Seiden believed that Taylor would not be able to comprehend abstract questions in order to assist his attorney during cross-examination of witnesses.
Dr. Colon, a forensic psychiatrist and consulting psychiatrist for Caddo Correctional Center, and his fellow at the time, Dr. John Turpin, reached a different conclusion. Dr. Colon and Dr. Turpin reviewed police reports, mental health records and medical records prior to interviewing Taylor. The doctors inquired into Taylor’s developmental, school, work, medical, psychiatric, family and legal history. Dr. Colon was impressed by Taylor’s ability to recall his past experiences, which were verified by ^Taylor's mother. Dr. Colon noted that Taylor received disability as a result of his mental and physical impairments (he had a history of foot and arm injuries), but did not appear to have any psychiatric issues beyond his mental retardation.
*968 Moreover, the doctors conducted a mental health status examination, to test Taylor’s orientation, memory, concentration, speech and language difficulties, ability to follow commands and executive functioning capabilities. The doctors found that Taylor did well on the exam. Dr. Colon diagnosed Taylor as being mildly retarded, and agreed that his IQ was at or near 56. The doctors assessed Taylor’s global assessment of function, or his ability to function independently, and found that he tested as being able to function independently.
Under the Bennett factors, Drs. Colon and Turpin believed that Taylor had the requisite capacity to stand trial. In particular, Taylor understood the nature of the charge he faced and could comprehend that if he was convicted he faced a sentence of death or life imprisonment. Specifically, Dr. Colon stated that Taylor told the doctors that he was charged with murder because he “was a part of the murder and did not tell anybody.” Taylor was also able to identify defenses available to a criminally accused person, such as self-defense, and understood the meaning of the word “alibi.” He also understood that if a person pleads guilty he admits to committing a crime and is punished by imprisonment, and if a person pleads not guilty then he proceeds to trial. Dr. Colon found that Taylor understood his legal rights, including his right to be represented by an attorney and his | fright to remain silent. Taylor knew the respective positions of the district attorney, the jury and his attorney. Dr. Colon testified that Taylor could recall and relate facts pertaining to his actions and whereabouts, including those involving the crime. When asked what Taylor would do if he noticed that a witness at his trial was speaking untruthfully, Taylor stated that he “would tell his attorney.” Like Dr. Colon, Dr. Turpin, who testified via videotaped deposition, found that Taylor possessed the capacity to stand trial.
James B. Pinkston, Ph.D., M.P., a neu-ropsychologist retained by the defense, agreed with Dr. Seiden that Taylor lacked the capacity to stand trial. After reviewing the same documents as Dr. Seiden, Dr. Pinkston interviewed Taylor, and administered a multiple choice verbal examination, known as the CAST MR (Competence Assessment for Standing Trial for Defendants with Mental Retardation), which is utilized by the psychiatric community to assess a mentally retarded person’s capacity to stand trial. Taylor answered several of the questions incorrectly. For example, he defined a plea bargain as “to have a Grand Jury trial.” Dr. Pinkston testified that based on the exam, Taylor appeared to have significant limitation in his understanding of basic legal concepts.
Additionally, Dr. Pinkston found that some of Taylor’s responses indicated “acquiescence bias.” In other words, Taylor would act as if he understood a concept or question when he in fact did not. Dr. Pinkston explained that acquiescence bias is a common behavior for mentally retarded individuals who pretend to comprehend a subject in an attempt to |7mask their mental deficiency. Dr. Pinkston was especially concerned with the complexity of the trial and Taylor’s decision whether or not to testify. Dr. Pinkston felt that Taylor would not be able to effectively weigh the risks and benefits of testifying on his own behalf. On cross-examination, Dr. Pink-ston acknowledged that Taylor provided Drs. Colon and Turpin with more accurate information than what was provided to him; Dr. Pinkston could not explain the variance. Dr. Pinkston also agreed that Taylor answered several questions correctly, including those involving more difficult legal concepts.
*969 Following arguments from both parties, the trial court determined that Taylor was competent to stand trial. Taylor waived arraignment and pled not guilty and not guilty by reason of insanity.
Subsequently, the trial court denied Taylor’s motion to suppress his statements made to police, finding that the motion was not supported by law or the evidence. Taylor sought supervisory review of the denial, which was denied on the showing made. Thereafter, a jury trial was held whereby Taylor was found guilty of manslaughter. The only evidence adduced at trial directly tying Taylor to Sills’ murder was Taylor’s statements to police and Detective Demery’s corresponding testimony.
At Taylor’s sentencing hearing, the state requested the trial court to review Vicki Britton’s testimony given during the sentencing phase of Tucker’s trial regarding the impact of Sills’ death on her and her family. The defense asked the trial court to consider the trial testimony of Taylor’s mother, who testified as to Taylor’s social, educational and mental health |shistory. The trial court noted its review of the evidence and the factors set forth in La. C. Cr. P. art. 894.1, and concluded that Taylor was in need of correctional treatment and that a lesser sentence would deprecate the seriousness of the crime. The trial court, after stating its consideration of Taylor’s mental status and the actions of Tucker, sentenced Taylor to serve 30 years at hard labor. Taylor filed a motion to reconsider, which the trial court ultimately denied. Taylor now appeals his conviction and sentence.
Discussion
On appeal, Taylor advances three arguments, each relating to his mental capacity to be convicted of manslaughter.

Capacity To Stand Trial

As his first assignment of error, Taylor contends that the trial court erred in concluding he was competent to stand trial. In support of this assertion, Taylor relies on the testimony of Drs. Pinkston and Seiden, who both concluded that Taylor lacked the capacity to proceed to trial. Taylor insists that he is mentally retarded and lacks the ability to assist counsel during a complicated trial, he has trouble focusing, and that his tendency to display acquiescence bias makes it difficult for counsel to know whether he understands explanations provided to him.
The due process clause of the Fourteenth Amendment protects an individual’s right not to proceed to trial while legally incompetent. State v. Odenbaugh, 2010-0268 (La.12/06/11), 82 So.3d 215, cert. denied, — U.S.-, 133 S.Ct. 410, 184 L.Ed.2d 51 (2012). Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the Incapacity to understand the proceedings against him or to assist in his defense. La. C. Cr. P. art. 641.
Louisiana law presumes a defendant’s sanity. La. R.S. 15:432; State v. Holmes, 2006-2988 (La.12/02/08), 5 So.3d 42, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Therefore, an accused bears the burden of proving by a preponderance of the evidence that he lacks the capacity to stand trial. Id. Although a trial court may receive expert medical testimony on the issue of a defendant’s competency to proceed to trial, the ultimate decision of capacity rests with the trial court. La. C. Cr. P. art. 647; State v. Holmes, supra. A reviewing court owes the trial court’s determinations as to the defendant’s competency great weight, and the trial court’s ruling thereon will not be disturbed on appeal absent an abuse of discretion. State v. Anderson, 2006-2987 *970 (La.09/09/08), 996 So.2d 973, cert. denied, 556 U.S. 1165, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009).
The Louisiana Supreme Court in State v. Bennett, 345 So.2d 1129 (La.1977), provided the proper considerations to determine whether a defendant is fully aware of the nature of the proceedings against him, which include whether he: (1) understands the nature of the charge and can appreciate its seriousness; (2) understands what defenses are available; (3) can distinguish a guilty plea from a not guilty plea and understand the consequences of each; (4) has an awareness of his legal rights; and, (5) understands the range of possible verdicts and the consequences of conviction.
|inThe Bennett court also provided the following factors to consider when determining an accused’s ability to assist in his defense including whether a defendant: (1) is able to recall and relate facts pertaining to his actions and whereabouts at certain times; (2) is able to assist counsel in locating and examining relevant witnesses; (3) is able to maintain a consistent defense; (4) is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; (5) has the ability to make simple decisions in response to well-explained alternatives; (6) he is capable of testifying in his own defense if necessary to defense strategy; and, (7) is apt to deteriorate mentally under the stress of trial.
The experts agreed that Taylor has an IQ of only 56, a condition which qualifies him as suffering from mild to moderate mental retardation. However, despite his apparent mental deficiencies, the trial court’s ruling finding Taylor competent to stand trial is entitled to great weight, and does not appear to be an abuse of discretion considering the evidence adduced at the sanity committee hearing.
As noted above, Dr. Colon utilized the Bennett factors to determine that Taylor understood the charges against him and could assist in his defense. Specifically, Dr. Colon found that Taylor understood that he had been charged with murder, and that the penalty if convicted was serious, a life or death sentence. Taylor also knew that his attorney would assist him at trial, could identify his defenses, was able to understand the concept of a plea bargain, knew that he had a right to remain silent, and appreciated the | ^respective positions of the district attorney, the jury and his attorney. Dr. Colon further testified that Taylor could recall and relate facts pertaining to his actions and whereabouts, including those involving the crime. When asked what Taylor would do if he noticed that a witness at his trial was speaking untruthfully, Taylor stated that he “would tell his attorney.”
Although Dr. Seiden ultimately concluded that Taylor lacked the capacity to stand trial, he conceded that Taylor understood the proceedings against him, could be taught to understand his right to testify, was able to identify witnesses for his attorneys to locate, and would understand the events of the crime and facts surrounding it. The doctors agreed that Taylor’s condition is static, and not susceptible of deterioration at trial.
Likewise, Dr. Pinkston also found that Taylor was not competent to proceed to trial. He indicated that Taylor could be expected to face significant difficulty in his factual and rational understanding of the proceedings against him, including his ability to understand the nature of the charges and their seriousness. Nevertheless, Dr. Pinkston acknowledged that Taylor knew the difference between a guilty plea and not guilty plea, understood his right to *971 remain silent, and could understand various legal terms.
A review of the record shows that the evidence, along with the fact that Taylor’s counsel could educate him on his legal rights, supports the trial court’s conclusion that Taylor was competent to stand trial. While the experts disagreed, the trial court’s ruling, which is entitled to great weight, |12is not an abuse of discretion. See State v. Holmes, supra. Accordingly, this assignment of error is without merit.

Waiver of Miranda Rights

As his second assignment of error, Taylor argues that the trial court erred in denying his motion to suppress. According to Taylor, the testimonies of Drs. Seiden and Chafetz proved that he lacked the ability to fully comprehend his Miranda rights at the time they were administered to him, thus his statements made to Detective Demery should have been inadmissible at trial. We disagree.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Beaner, 42,582 (La.App.2d Cir.12/05/07), 974 So.2d 667, writ denied, 2008-0061 (La.05/30/08), 983 So.2d 896.
Before the state can introduce any inculpatory statement made in police custody, it bears the heavy burden of establishing that Taylor received a Miranda warning and that the statement was freely and voluntarily made, and not the product of fear, duress, intimidation, menaces, threats, inducements or promises. La. C. Cr. P. art. 703; La. R.S. 15:451; State v. Johnson, 36,014 (La.App.2d Cir.06/12/02), 821 So.2d 652. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper 11sinfluence, must be considered involuntary and inadmissible. State v. Roddy, 33,112 (La.App. 2d Cir.04/07/00), 756 So.2d 1272, writ denied, 2000-1427 (La.05/11/01), 791 So.2d 1288.
In reviewing the correctness of a trial court’s ruling on a motion to suppress a confession, the reviewing court should defer to the finding of the trial judge unless his finding is not adequately supported by reliable evidence. State v. Green, 1994-0887 (La.05/22/95), 655 So.2d 272. We place great weight upon the trial court’s factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Beaner, supra. Testimony of the interviewing police officers alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, 39,970 (La.App.2d Cir.08/19/05), 909 So.2d 1038.
Diminished mental or intellectual capacity does not in and of itself render a defendant incapable of a knowing and voluntary waiver of his rights. State v. Tart, 1993-0772 (La.02/09/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). However, in the face of such deficiencies the state must rebut the allegations despite the fact that the defendant ordinarily bears the burden of proving mental illness, but the critical factor is still whether or not the defendant was able to understand the rights explained to him and voluntarily give a statement. State v. Tart, supra. Any mental incapacity is an important factor to consider in deciding the voluntariness of a confession. State v. King, 41,084 (La.App.2d Cir.06/30/06), 935 So.2d 815, writ denied, 2006-1803 (La.02/16/07), 949 So.2d 411. Voluntariness is determined on a case-by-case 114basis, under a totality of the circumstances standard. State v. Manning, 2003-1982 (La.10/19/04), 885 So.2d 1044, *972 cert denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
Here, there is no question that Taylor was informed of his Miranda rights before each interview with Detective Dem-ery. There is also no evidence which suggests that Taylor was coerced, forced, or otherwise mistreated in detailing his involvement in the murder. Thus, the critical issue here is whether Taylor sufficiently understood his Miranda rights to make a knowing and intelligent waiver of such rights. Based on a careful and complete review of the record, we conclude that the state met its burden of proof.
A hearing was conducted over the course of several days regarding Taylor’s motions to suppress. Detective Demery testified that he called Taylor on September 15, 2008, at a residence in Crowville, Louisiana, after Tucker told police that Taylor was present during Sills’ murder. Taylor agreed to meet Det. Demery and gave him directions to the house in Crow-ville. Det. Demery testified that when he interviewed Taylor he was outside of his jurisdiction and did not have the authority to arrest Taylor, but that a local officer who accompanied Det. Demery did have such authority. Detective Demery explained that despite this initial interview being noncustodial, he nonetheless advised Taylor of his Miranda rights and ensured Taylor that police were simply conducting an investigation.
Detective Demery testified that Taylor’s demeanor was calm, and he did not appear to be under the influence of alcohol or narcotics. Notably, |1sDet. Demery testified that Taylor did not appear to be mentally impaired, as he seemed to understand the questions asked. However, Det. Dem-ery admitted that he would have ended the interview had he known that Taylor was mentally retarded. When Det. Demery confronted Taylor with Tucker’s allegation that Taylor was present at the time of Sills’ murder, Taylor repeatedly denied being at the pond. Even after Det. Demery explained that Tucker’s story did not implicate Taylor as an accomplice, Taylor refused to admit he was with Tucker at the time of the murder. In fact, Taylor told Det. Demery that he heard rumors that two other men were with Taylor at the time of the murder.
The audio recording of Taylor’s September 15, 2008, statement, which was played in open court, corroborated Det. Demery’s testimony. In particular, the recording revealed that Det. Demery read Taylor his Miranda rights, stopping after reading each specific warning to ascertain whether Taylor understood his rights. Additionally, Det. Demery further explained to Taylor that he was not under arrest and was under no obligation to speak with the police. Taylor indicated that he completed grade 12 and knew how to read and write. He then signed the Miranda rights waiver form and gave a statement consistently denying lending Tucker a gun or knowing that Tucker was going to kills Sills beforehand.
Detective Demery then explained that after this initial interview, Taylor called his office several times asking about the status of the case. On September 17, 2008, Taylor voluntarily took a bus to Shreveport to meet Det. Demery. Detective Demery testified that Taylor appeared coherent and | ^understood the questions asked of him. Taylor was again advised of his Miranda rights and signed another waiver card.
These statements made to Det. Demery on September 17, 2008, were played in open court. In the first statement, Taylor denied being under the influence of alcohol or drugs, stated that he completed the 12th grade and that he could read and *973 write. Again, Det. Demery advised Taylor of his rights, asking Taylor if he understood each specific right, which Taylor responded affirmatively. Detective Demery told Taylor that he was not under arrest, but that he was being interviewed as part of an investigation; Taylor then signed a waiver of his rights. During this interview, Taylor changed his story and explained that on the day of the murder, Tucker and Sills came to his house and asked him to go fishing. Taylor left with the pair, but Tucker stopped at his house to get lighter fluid before heading to the pond. Taylor then explained that when they got to the pond, he started to fish while Tucker and Sills went some distance farther down the path. Taylor heard shots, and when he came upon Sills and Tucker, Sills was in the water and Tucker was trying to shoot her again. Taylor said he told Tucker that he did not want any part in the crime, but ultimately helped Tucker by using a large branch to push Sills’ body out further into the pond.
Taylor also told police that Tucker had told him weeks before the murder that he wanted to hurt or “burn up” a “female.” However, after Det. Demery admonished Taylor to tell the whole story, Taylor admitted giving Tucker a gun a few days before the murder, and that Tucker told Taylor that he was going to shoot Sills and burn the body.
| nThe audio recording of Taylor’s second statement on September 17, 2008, was also played in open court, where Taylor explained in greater detail his actions on the day of the murder. He relayed to Det. Demery that he never thought Tucker would actually kill Sills and that when he heard the shots he was scared. He said that after Tucker shot Sills, Taylor started pouring lighter fluid on Sills and then Sills jumped into the pond to avoid being set on fire. Taylor then went to burn the lighter fluid container because he touched it and didn’t want his fingerprints to be found. Tucker asked Taylor to help him push Sills’ body out farther into the pond, Taylor eventually agreed and the men used a large branch to push the body farther out into the pond. Taylor then volunteered to take Det. Demery out to the crime scene. After the interview ended, Taylor was placed under arrest.
On September 18, 2008, Taylor accompanied Det. Demery and several other police officers to the scene of the murder. Taylor was again advised of his rights, which was evidenced in a video taken of the interview. Taylor again waived his rights and showed police where Sills was shot, where Tucker was standing, where they were when Tucker poured lighter fluid on Sills, where she jumped in the pond to avoid being set on fire, and the location of the burned lighter fluid container. Detective Demery confirmed that the information Taylor provided was consistent with the evidence collected at the scene.
Detective Smith, who was present during the first two interviews, also testified at the hearing and substantially corroborated Det. Demery’s testimony, confirming that Taylor did not appear to be mentally retarded.
118Pr. Frank Chafetz, a neuropsychologist, was hired by the state to examine Taylor. Dr. Chafetz reviewed all of Taylor’s school, medical and mental records, and the transcripts of his statements to police. He noted that Det. Demery explained each of Taylor’s Miranda rights, asking after each recitation if Taylor understood his rights. Additionally, during the interviews, Taylor seemed to understand the questions asked of him, and responded appropriately. Dr. Chafetz conducted several tests to determine Taylor’s ability to understand when people were speaking to .him, to test his reading and *974 verbal skills, and to comprehend Taylor’s emotional functioning. Dr. Chafetz agreed that Taylor was mildly to moderately mentally retarded, with an IQ of approximately 53; however, he also found signs that Taylor had malingered, or made efforts to exaggerate his mental disability. However, when considering Taylor’s oral comprehension of words in general, Dr. Chafetz concluded that Taylor would not be able to understand his Miranda rights. Dr. Chaf-etz also pointed out that Taylor did not have an arrest record, which would have provided him with some guidance regarding his rights.
Deputy Antonio Harris, a deputy at the Caddo Correctional Center, testified that he has observed Taylor in jail and that Taylor participated in group programs. Deputy Harris testified that Taylor had made written requests in jail, used the jail’s monetary system, appeared to understand the rules, and often reads Harlequin-style novels.
Dr. Seiden testified in two separate regards at Taylor’s motion to suppress hearing. Dr. Seiden first testified that Taylor was not suffering h/rom any mental disease or defect that interfered with his ability to distinguish right from wrong at the time of the offense. In fact, Dr. Seiden explained that after reviewing the statements Taylor made to police and the deposition testimony of Dr. Turpin regarding his evaluation of Taylor, Dr. Seiden believed that Taylor had exaggerated the extent of his impairment during Dr. Seiden’s initial assessment of Taylor. Dr. Seiden also found that Taylor understood the questions being asked by the police when he made his statements, but Dr. Seiden did not evaluate Taylor’s ability to waive his Miranda rights.
Dr. Seiden’s second testimony was in regard to whether Taylor understood his Miranda rights. Dr. Seiden explained that prior to his interview with Taylor, he advised him that anything discussed during their interview was not confidential and would be reported to the court. In doing so, Dr. Seiden said he used simple language to ensure Taylor understood the situation. Dr. Seiden used a technique developed by Dr. Thomas Grisso to test Taylor’s ability to comprehend his Miranda rights. Dr. Seiden testified that he read Taylor the Miranda statement used by Detective Demery and found that Taylor was not able to comprehend the meaning of it. Dr. Seiden pointed out that the Miranda statement used by Detective Demery was written at a tenth grade reading level. Taylor did not understand the meaning of the words “privilege” or “waive.”
Dr. Seiden explained that individuals with lower IQs are less likely to understand their Miranda rights and that Taylor, throughout his life, has consistently tested as just above moderate mental retardation. While |gnadmitting that Taylor had previously seemed to malinger his mental disability, Dr. Seiden testified that Taylor did not appear to exaggerate his disability regarding his understanding of his Miranda rights, but found that his overall performance was consistent with his IQ testing. Taylor told Dr. Seiden that he spoke with police because he thought that if he refused he would be taken to jail. Dr. Seiden noted that it is common for mentally retarded individuals in police interrogations to be compliant. Dr. Seiden stated that he was also concerned that Taylor did not validly waive his Miranda rights because Taylor does not understand the concept of principal to a felony, and did not understand that at the time that he was being interrogated. Basically, Dr. Seiden explained that Taylor thought he was exculpating himself by telling police that Tucker killed Sills. Dr. *975 Seiden concluded that even taking into account Taylor’s tendency to malinger, Taylor was not capable of either giving a knowing and intelligent waiver, or comprehending the rights he was giving up.
Although the experts testified that Taylor was unable to comprehend his Miranda rights, the actions of Taylor and the testimony of Det. Deinery support the finding that Taylor knowingly and voluntarily waived his Miranda rights. As shown in open court via Taylor’s audio and video confessions, Det. Demery explained to Taylor each individual right enumerated in Miranda. Taylor appeared to understand the questions, and he answered appropriately. Notably, both Dets. Demery and Smith testified that Taylor never exhibited any indication of a mental issue or that he did not understand any of his rights. Further, the record reveals that at each 121 separate interview, Taylor responded to the detectives’ questions with detailed and narrative answers.
Here, the trial court obviously leaned on the testimony of the investigating officers as well as Taylor’s own responses to the questions as heard in open court to find that he understood his Miranda rights. As explained above, testimony of the interviewing police officers alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, supra. Based on a review of the record, the trial court’s ruling finding that Taylor understood and waived his Miranda rights is adequately supported by the evidence. Accordingly, this assignment of error is without merit.

Excessive Sentence

Taylor’s third, fourth, and fifth assignments of error all relate to whether the trial court imposed an excessive sentence. Taylor argues that the trial court did not give enough weight to the fact that he is mentally retarded, he had no criminal history, and that Tucker, not Taylor, was the shooter and mastermind behind the killing of Sills.
The test for reviewing an excessive sentence claim is two-pronged, First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Lathan, 41,855 (La.App.2d Cir.02/28/07), 958 So.2d 890, writ denied, 2007-0805 (La.03/28/08), 978 So.2d 297. The articulation of the factual l^basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. The important elements which should be considered include the defen dant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Haley, 38,258 (La.App.2d Cir.04/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.06/24/05), 904 So.2d 728. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr. P. art. 894.1. State v. Swayzer, 43,350 (La.App.2d Cir.08/13/08), 989 So.2d 267, writ denied, 2008-2697 (La.09/18/09), 17 So.3d 388. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.09/28/07), 964 So.2d 351.
Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence violates La. Const. Art. I, § 20 if it is grossly disproportionate to the seriousness of the offense *976 or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.01/14/03), 839 So.2d 1. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.01/15/02), 805 So.2d 166.
The trial court is given wide discretion in the imposition of sentences within the statutory limits. The sentence imposed will not be set aside as | ^excessive absent a manifest abuse of that discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7; State v. Diaz, 46,750 (La.App.2d Cir.12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams, supra; State v. Free, 46,894 (La.App.2d Cir.01/25/12), 86 So.3d 29.
Manslaughter is punishable by imprisonment at hard labor for not more than 40 - years. La. R.S.-14:31.
Here, the trial court did not abuse its discretion in sentencing Taylor to serve 30 years at hard labor. Although no pre-sentence investigation (“PSI”) was ordered, the trial court was not required to do so, and Taylor’s educational, social, work and criminal history was thoroughly explored by the trial court during the sanity committee hearing. Additionally, the record reveals that the trial court reviewed the sentencing factors under La. C. Cr. P. art. 894.1, particularly finding that Taylor was in need of correctional treatment and that a lesser sentence would deprecate the seriousness of the crime. The trial court also noted Taylor’s mental status as well as both his and Tucker’s actions throughout the commission of the crime.
Moreover, Taylor’s sentence, when viewed in light of the harm done to society, does not shock the sense of justice. The record is clear that Taylor knew right from wrong and that he knowingly and willingly participated in the killing of a young 18-year old female and her unborn child under horrific circumstances. These assignments of error are also without merit.
| ^Conclusion
So considering, the conviction and sentence of Marcus Andrew Taylor is affirmed.
AFFIRMED.

. Tucker was ultimately convicted of first degree murder and sentenced to death for his role in Sills' murder.