CARAWAY, J.
| temario Little was indicted by a grand jury and subsequently convicted of second degree murder. He was sentenced to the mandatory term of life imprisonment. Little now appeals arguing, that the evidence was insufficient to support the conviction and that the trial court erred in denying his motion to suppress statements. We affirm the conviction and sentence.

Facts

On July 30, 2011, Roshenna Crowder was shot and killed as she hid in the closet of her bedroom in the house she shared with her boyfriend, Donald Brown (a/k/a “Scrap”). Brown was also shot several times, in the leg, groin and eye, but survived. Roshenna’s two children (4 and 8 years old) were in the home when the shooting occurred and ran to their grandmother’s home and reported that their mother was dead. They were able to say that some men knocked on the door, came in with a gun and shot their mother. Police were dispatched to the scene.
It was not until late 2011 that police received information implicating Demario Little as the shooter.[1] It was then that one of Little’s girlfriend’s sons gave police information that ultimately connected his brothers, Kenneth and Tracy Moore, to *1221 the crime. The Moore brothers admitted their participation in the events leading up to the shooting and separately provided very detailed information about the crime. Their identification of 12Little as the shooter led to his arrest in December of 2011. A grand jury indictment was handed down on January 19, 2012, charging Little with the second degree murder of Crowder. Little was convicted as charged by a jury on April 25, 2014. He received the mandatory life sentence. He has appealed his conviction and sentence.

Discussion

In his first assigned error, Little argues that the evidence' presented by the state was insufficient to convict him. Specifically, his argument is presented in brief as follows:
The State charged three other people with this murder, based on the statements of two of those men. Then, the State decided a version of the story where Demario Little was the shooter made more sense. The testimony provided at trial to support this allegation was not sufficient to' convict Demario Little of second degree murder.
In his pro se brief, Little provides no additional argument, but includes a lengthy discussion of inconsistencies among the various witnesses’ accounts of the circumstances of the offense. '
The evidence presented at trial included the testimony of Corporal John Madgerick, one of the officers responding to the scene, who described what he saw from a video and photographic evidence as well as his memory. Madgerick testified that when the first officers arrived, Crowder was found deceased in the closet of her bedroom, partially covered with a jacket as if she were trying to hide. The closet had no door, but was covered with a curtain. Brown was still alive, lying on the floor of the bedroom next to the bed, clutching a cereal box with marijuana inside. Mad-gerick stated that | -¡marijuana was found in the bedroom and the kitchen as well as loose tobacco, cigar wrappers and sandwich bags. In the bedroom where the victims were found, drawers on the dresser were open. Five spent bullet cartridge cases were located in the bedroom; no guns were found.
Carla White of the Northwest Louisiana Crime Lab testified that the cartridge casings were from a 9mm gun, most likely a pistol. She also identified a 9mm bullet, taken from the victim.
Dr. Long Jin, who performed the autopsy on the victim, testified that she suffered six gunshot wounds, including one to the head .and two near the chest area which would have been fatal. Dr. Jin testified that the trajectory of these bullets would have been from top to bottom and front to back with the shooter being above the victim. Dr. Jin believed the wounds were “distance” wounds due to the lack of soot and estimated that they were shot from a distance of up to three feet away.
Detective Rod Demery, the lead investigator on the case, testified he spoke with Crowder’s children on the night of the crime: He stated that the 4-year-old little boy kept saying that the man who came into his house looked like Snoop Dogg, a famous rapper. From his observation of the crime scene, Demery believed that the incident involved a home invasion robbery: Detective Demery suspected that Crowder and Brown were selling drugs from the home because the front door was fortified with wooden braces from the inside. He testified that it did not appear that the door had been kicked in or damaged in any way.
LDemery stated that early on in his investigation he received tips from two jailhouse informants that Barnell Johnson *1222 (a/k/a Freddie Loke) and Shawnee Barnard were involved in the homicide. He was told that the two men had kicked in the door and shot and robbed Crowder and Brown. One of the individuals had been housed with Johnson at some point. The other came into prison after the incident. Johnson and Bernard were currently under investigation for unrelated armed robberies, and were eventually arrested for those robberies. While incarcerated, they each began telling officers that the other had committed the murder of Crow-der.
When Brown regained consciousness, but was still in the hospital and unable to speak, Detective Demery presented him with photographic “arrays” containing Johnson’s and Bernard’s photographs. Brown was unable to speak and pointed to the two men when asked if he could identify who robbed and shot him. Demery testified that Brown “seemed to be awake” and understand what he was saying.
Detective Demery testified that this gave him probable cause to believe that Johnson and Bernard committed the murder and, thus, he arrested them and charged them with Crowder’s murder approximately a month after the crime. He further testified, however, that he was not convinced that the men were the real offenders and he chose to keep the case open and continue the investigation because the two men did not know any details of the crime and the door did not appear to have been kicked in. 15Pemery also referenced a later recantation by Brown of his identification of Johnson and Bernard.[2]
Nearly six months after the murder, Detective Demery testified that he was informed by a veteran detective that a burglary suspect who was in custody claimed to have information about Crow-der’s murder. Detective Demery stated that he went to the jail to interview Danta-vious Jamerson. Jamerson told Demery that his brother, Kenneth Moore, had admitted being involved in the murder and that Little had shot and killed Crowder. At the time of the murder, Little had been dating Polly West, Kenneth’s mother, for approximately a year and a half. Jamer-son told Demery that on the day of the incident, his mother was crying because she was short on money. Little wanted to get money, but Kenneth told him he would not rob anybody. Eventually, Little and Kenneth left the house and went to Crow-der’s home and asked for a nickel pouch of marijuana. When Crowder declined, Little pulled out a gun and said he wanted everything. Crowder ran to a back room yelling for Brown. Little followed and shot Brown a couple of times, in the groin area and once in the eye. Demery knew that some of the information relayed by Jamerson was not released to the public or media.
Demery testified that Kenneth Moore “told me the exact same story as his brother told me, but he was a little more descriptive.” Kenneth admitted to taking money off of the dresser and that his brother Tracy was involved. lfiKenneth told Demery that Little got weed and then shot Brown in the groin area and then “shot his eye out.”
Demery also spoke with Tracy, who admitted that he was at the scene of the crime and had been in Minden ever since.
Demery testified that he “tried to extract more details from them,” including the layout of the house. Both men were very descriptive. Kenneth told the officer *1223 where he saw Brown eating on the night of the crime, which explained the half-eaten plate of food found at the scene. Tracy-described what Brown was wearing in detail, including a green and red belt. He also described Crowder’s clothing and stated that she was in a closet that had no door but a curtain opening. Demery testified that the brothers were able to provide details about the crime that Johnson and Bernard did not.
Demery also interviewed Polly West, the mother of the Moore brothers and Little’s girlfriend. She “told me pretty much the same story,” according to Demery. West also informed Demery that she and Little had sold the gun to a man at a local convenience store. She stated that after the crime, “they went to Minden and then they went to Denton, Texas.”
Demery stated that police were able to locate the person to whom Little and West sold the gun but it was not recovered because the individual had sold it. It was at this point Demery determined to get a warrant for Little’s arrest. Little was apprehended at West’s home. Neither Moore brother was arrested despite their alleged involvement in the crime. While in custody, Little provided three recorded statements to Demery.
|7In the first statement, Little denied any involvement in, or knowledge of the murder, although he admitted that he, Tracy and Kenneth purchased marijuana from Crowder and Brown that evening. Little denied being present when the later shootings occurred.
In the second statement, Little admitted that because he and West were having financial problems, he went to Brown’s house “to rob them.” Little admitted that he took a gun. Little explained that he asked for a nickel bag and “upped the gun,” before going in. He acknowledged that he shot Brown because he thought he was going for something or a gun. Little told Demery that the bullets must have gone through the wall and hit Crowder. Initially, Little stated that he shot three times, but later advised that he could not remember how many times he shot. He admitted taking marijuana and money and that he sold the gun to an unnamed individual in the Cedar Grove area.
In the third statement, Little recanted, stating that he did not participate in the shootings. At one point in the third statement, Little stated that Tracy shot Brown and denied knowing how Crowder was shot. The audio recorded statements were introduced at trial and played for the jury.
Both Tracy and Kenneth testified at trial. They stated that, on the day of the incident at 6:00-6:30 p.m., the three men were at a home on Southern Avenue that their mother and Little shared. Little had asked the brothers to go with him to buy some “weed” and the three men walked to Crowder and Brown’s house on Fairfield Avenue. According to Tracy and Kenneth, Crowder answered the door and Little asked her for a “nickel bag,” or $5.00 Isworth of marijuana. Crowder responded that they did not sell “nicks” and Little then said “we will take everything” and produced a handgun. Crowder fled, yelling “Scrap, Scrap” and Little followed her, trailed by Tracy and Kenneth. They both testified that Little shot both Brown and Crowder and took money and marijuana before the trio fled the home.
Specifically, 22-year-old Tracy testified that he knew Brown and his girlfriend because he had bought marijuana from them before. He stated that the three did not discuss what would happen when they got to the residence. Tracy claimed that he knocked on the door and Brown’s girlfriend let them in. He gave her the $5 that came from Kenneth. Tracy stated *1224 that Little had shown the brothers the 9mm handgun prior to the offense. Tracy saw a young boy in the house who appeared as his mother screamed.
Tracy claimed that he was “right at the door” of the bedroom as Little shot. He saw Brown, who was already shot and pleading for his life. He stated that Brown kept saying “it’s in the drawer” as Little kept asking “where’s it at,” referring to marijuana and money. Tracy testified that Little shot Brown again, in the eye. Tracy testified that Little “went to the closet,” and “looked both ways and then he just shot.” Tracy recalled that Little shot four times. He did not see Crowder again after she ran into the bedroom. Tracy also recalled that Little took three bags of marijuana, but he did not see him take any money. However, “when he left out of there,” Tracy testified that Little had money and he gave him and Kenneth over $100 |seach. Kenneth claimed that neither he nor Kenneth took anything from the house.
Tracy further testified that, after the shooting, the three men ran back to West’s house on Southern Avenue. According to Tracy, as soon as they got to the house, Little called his cousin “Pooh” to drive them and West to a hotel room on Monk-house Drive. Tracy testified that he stayed at the hotel for four to five hours and then had his cousin drive him back to Minden. He denied smoking marijuana. He claimed that the other three stayed at the hotel and did not know if they came to Minden. Tracy testified that the last he heard was that they had gone to Texas. Little told them not to say anything about the murder and that “if he go down for this, if this come out, he down, we going to go down with him.” 1
In his testimony, 21-year-old Kenneth explained that he, Tracy and Little were at his mother’s house that evening and his mother was upset about paying bills. According to Kenneth, Little wanted him and Tracy to go “hit a lick,” or rob someone, but the brothers declined. The men agreed to go with Little to buy some “weed,” although at the time Kenneth did not smoke it. Kenneth testified that as they walked, he gave Little $5.00 to purchase the marijuana. As they arrived at Crowder’s home, he saw the front door open, but the "screen door shut. He had never been to the home. Kenneth recalled that Little knocked on the door. The three went in and Kenneth recalled seeing a little boy and a black and white pitbull dog in the home. When Crowder told the men she did not sell nickel bags, Kenneth thought they were leaving. Instead, Little chased Crowder with a black Lphandgun and shot. Kenneth stated that Little told the brothers to “get in here,” and they complied. It was then that Kenneth saw Brown on the floor between the bed and the dresser, shot and pleading for his life. Little continued to demand money and weed according to Kenneth. Brown “kept saying something about the bottom drawer.”
Kenneth testified that Little was “bouncing around and shooting [Brown]” and he saw Brown’s eyeball pop out from the gunshot. Kenneth further stated that, after Little shot Brown several times, he walked over to the closet and “fired the gun in the closet,” more than once. Kenneth stated that he did not see Crowder again, but that Little shouted to him and Tracy to grab something or he would kill them. Kenneth took marijuana and money.
Kenneth corroborated Tracy’s testimony that the three men returned to West’s home after the incident. Little’s cousin “picked us up” and the men and West went to a hotel on Monkhouse Drive. Kenneth testified that Little gave him and *1225 Tracy some of the money he had taken during the offense. He estimated it was no more than $400. Kenneth further stated that Little told them that if-either of them said anything, “I’m going to kill ya’ll. and I’m going to kill your mama.” Kenneth confirmed that the group traveled to Minden to stay with relatives for about a week and then came back without Tracy, who stayed in Minden. Kenneth testified that West and Little went to Texas. He claimed to be afraid of Little because he had regularly beaten and threatened his mother.
In On cross-examination Kenneth could not recall that he told Demery that the three had discussed committing an armed robbery as they walked to Crowder’s home. He claimed that he told West about what happened when they arrived at the hotel. He did not inform the police because he was afraid of Little.
West also testified at trial and confirmed that she and Little had an eighteen month relationship. The two moved to her Southern Avenue home during that time. She described a similar scene at her home before Tracy, Kenneth and Little left to go “on Fairfield” to buy some “weed” on the evening of the murder. West testified that, when the three men returned home, Little was saying “let’s go ... get your stuff and let’s go.” West testified that Little told her “I killed them” and that “the kids were there.” She claimed that Little demonstrated to her how he fired the shots. She stated, “[Little] said the dude was laying down, saying, please don’t kill me.” West claimed that every time Brown asked Little not to kill him, Little shot.
West then testified that Little asked one of her boys where Crowder was. When they told Little where she was, he “went to the closet and just started opening fire.” West confirmed that the four walked to Little’s cousin’s house and “Pooh” took the group to the hotel room on Monkhouse Drive. Little gave his cousin money to pay for the room. Nothing was discussed in the hotel room; Little and Tracy smoked marijuana and West watched the news. According to West, the four went to Minden. All but Tracy returned to Shreveport. She and Little stayed there for about a month |12and then went to Denton, Texas. West explained in her testimony that, some time later, Little told her that there had been a young boy and girl and a pitbull dog in the house and that the children “took off running.” Little also told her that he had left marijuana at the scene “so it can look like [a] drug-deal-gone-bad.”
Perhaps most significant to West’s testimony was her recognition of several letters written to her by Little while he was incarcerated on the charge of second degree murder. The letters were introduced at trial and contained emotional pleas to West to hire Little an attorney and help him. Therein,- Little instructed West to tell Tracy and Kenneth to tell the authorities that they lied when they implicated him in murder. He further instructed her to tell the brothers to say that Detective Demery coerced their statements and ■ wanted her to have Tracy and Kenneth execute notarized affidavits to that effect. West admitted that in the letters, Little asked her tó lie about what happened on the night of the crime. West did not comply with Little’s requests.
On cross-examination, West denied being emotional the day of the crime, but stated she had a headache. She stated that when the three men returned from getting marijuana, they were sweating from running. She noticed that her boys seemed' upset. It was days after the incident that Little discussed what happened. She testified that “as it went on and on *1226 and he saw it on the news,” he then stated that “it was over with.” She admitted that she wrote the letters on her own and that Little did not threaten her. 11sWest conceded that she had been convicted of distribution of crack cocaine and successfully completed probation with the exception of a later arrest.
The defense called three witnesses, including Marquis Walker, Brown and Little, who testified on his own behalf. Walker repeatedly stated that he had nothing he wanted to say and ultimately invoked his Fifth Amendment privilege against self-incrimination.
Brown testified that he did not remember many of the events of the evening when he was shot. He testified that before the incident, he answered the door and saw Little, Loke and Shawnee Bernard at his door. He did not personally know the men but had seen them in his neighborhood. Brown denied that Kenneth and Stacy were at his door and recalled “it was dark,” when the men came to his house. He admitted that he picked out Bernard and Loke in a photographic lineup, but testified that he identified Little in a lineup as well. Brown initially stated that he saw the photographic lineups after he got out of the hospital, but when prompted, stated that he recalled Detective Demery visiting him in the hos- ' pital. He insisted that he identified Little as a person involved in this matter, but changed his testimony, then indicating that he saw Little’s photograph on the news and identified him. Brown also testified that Demery showed him a photograph of Little.
On cross-examination, Brown admitted that he had no recollection of his time in the hospital. He had several surgeries for his injuries and was currently undergoing psychiatric treatment to assist him with his emotional | ustate. The state stipulated that the first time the state was aware of Brown ever mentioning the name Little was in a pretrial meeting on April 10, 2014.
Finally, 30-year-old Little testified on his own behalf. He denied killing Crow-der, but admitted that the three went to buy marijuana on the day of the offense and that he used $15 of his own money to buy the drugs. He stated that he had a total of $150 on his person. Little testified that Tracy and Kenneth said they knew Brown. He claimed that Crowder “served us for the $10,” and the three went back to West’s house. He did not see Brown or any children in the house.
After that, Little testified that “we had to leave because we had been evicted from the house.” They stayed in the house for 30 minutes before leaving. Little claimed that they went to his cousin’s house and he used money he had received from his uncle to pay for the hotel room. He did not get the room in his name because he did not have identification. The next day Little, West and her two sons traveled to Minden, where they stayed for a couple of weeks. Ultimately, West and Little went to Den-ton, Texas, in October and came back to Shreveport for Thanksgiving. It was about a month before his arrest. Little denied involvement in the offense and testified that he was beaten during his arrest.[3] He claimed to have learned of the *1227 murder from the news. He did not let the police know he was at the home before the murder because he “mind[s] his own business.” Little 1 ^admitted that he had a .38 snub-nosed revolver that he sold before he went to buy marijuana from Crowder. He testified that this explained the $150 he had. He sold the gun because as a convicted felon, he was not supposed to have a gun and already had a conviction for possession of a firearm by a convicted felon.
Regarding his interview with Detective Demery, Little admitted that he gave three statements. He testified that he made different statements because he was threatened. He cooperated with Demery in the second statement because Demery kept pressuring him to admit to something. He also testified that before the second statement Demery told him about the brothers implicating him and that they would not be charged. Little testified that he thought if he “cooperated,” he would be allowed to go home. Little’s testimony completed the trial.
On appellate review, sufficiency of evidence claims are considered first because the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier could reasonably' deduce from the evidence. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Brown, 43,916 (La.App.2d Cir.2/25/09), 4 So.3d 301, writ denied, 09-0701 (La.12/11/09), 23 So.3d 912. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
In Louisiana, an accomplice is qualified to testify against a co-perpetrator even if the State offers him inducements to testify. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047. The inducements would merely affect the witness’s credibility. Id. An accomplice’s testimony is materially corroborated if there is evidence that confirms material points in the accomplice’s tale, the defendant’s identity and some relationship to the | t7situation. Id. Independent witness as well as other co-accomplice testimony may provide sufficient material corroboration. Id.
*1228 La. R.S. 14:30.1, Second degree murder, provides in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm;' or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
* * *
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor -without benefit of parole, probation, or suspension of sentence;
After viewing the. evidence in the light most favorable to the state, we find the evidence sufficient to support Little’s second degree murder conviction. Little first suggests that the gravity of the evidence against him is lessened by the fact that other possible offenders had been arrested early on for the murder. Nevertheless, the jury was made fully aware of those facts through Demery’s and Brown’s testimony. Brown’s inconsistent recollection of the events could have reasonably been rejected by the jury as unreliable considering that Brown had received a serious head injury in the shooting. Demery explained that while he had probable cause to arrest the other men, he did not find the evidence credible or conclusive. That explanation could be accepted by the jury.
| 1RThe remaining evidence against Little, both testimonial and documentary, is sufficient to support - the conviction. Despite Little’s denial of any involvement in the crime, the jury clearly chose to credit the testimony of the other witnesses that refuted his claims. Little focuses his argument on minor inconsistencies in the various witnesses’ accounts of events occurring before and after the murder. Regarding facts relating to what transpired after the three men entered the home, .however, both Tracy and Kenneth knew very specific details about the offense that had not been released to the media. The medical testimony corroborated Tracy and Kenneth’s accounts of how Little shot the victims. Before the incident Tracy saw Little with a 9mm pistol. This intimate knowledge of these details substantiated the brothers’ credibility. Additionally, in coming forward, both brothers exposed themselves to criminal charges.
If believed, this evidence establishes that Little, accompanied by Tracy, and Kenneth, went to buy marijuana from Crowder and Brown. While there, Little pulled out a gun and shot both victims. With these eyewitness accounts, West also testified that Little confessed his actions to her. The letters written between-the two showed Little’s attempts to get the brothers to change their stories. Little’s flight from Shreveport almost immediately after the crime and attempt to hide from police at the time of his arrest, imply evidence of his guilt. In one of his statements to police Little admitted to the crime and his intent to commit armed robbery. The totality of the evidence is sufficient for.a rational trier of fact to conclude [ T9beyond a reasonable doubt that Little was guilty of every essential element of second degree murder. This assignment of error is without.merit.
In his second assignment of error Little argues that the trial court erred in deny *1229 ing his motion to suppress his inculpatory statement made to Demery. Little argues that while he was advised of his rights, his statement' was not free and voluntary because it was made in fear and under the belief that he would not be charged if he made a statement.
The state must establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Coleman, 48,168 (La.App.2d Cir.07/17/13), 121 So.3d 703, writ denied, 13-1990 (La.05/02/14), 138 So.3d 1237. The state also bears the burden of establishing that the statement was freely-and voluntarily made, and not the product of fear, duress, intimidation, menaces, threats, inducements or promises. La. C.Cr.P. art. 703; La. R.S. 15:451; State v. Morrison, 43,815 (La.App.2d Cir.1/14/09), 999 So.2d 1197, writ denied, 09-0362 (La.11/6/09), 21 So.3d 299.
As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Taylor, 49,467 (La.App.2d Cir.1/14/15), 161 So.3d 963; State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 00-1427 (La.05/11/01), 791 So.2d 1288. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. State v. Parker, 48,339 (La.App.2d Cir.10/09/13), 124 So.3d 516.
| gf|The appellate court may review the entire record, including-testimony at trial. State v. Brooks, 92-3331 (La.01/17/95), 648 So.2d 366; State v. Monroe, 49,365 (La.App.2d Cir.11/19/14), 152 So.3d 1011. In reviewing the correctness of a trial court’s ruling on a motion to suppress a confession, the reviewing court should defer to the finding of the trial judge unless his finding is not adequately supported by reliable evidence. State v. Green, 94-0887 (La.05/22/95), 655 So.2d 272. The appellate court places great weight upon the trial court’s factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Beaner, 42,532 (La.App.2d Cir.12/05/07), 974 So.2d 667, writ denied, 08-0061 (La.05/30/08), 983 So.2d 896.
Testimony of the interviewing police officers alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Taylor, supra; State v. Bowers, 39,970 (La.App. 2d Cir.08/19/05), 909 So.2d 1038.
At the hearing on the motion to suppress, Demery testified that he made no threats against or promises to Little regarding his statements. He emphatically denied that he told Little he would not be charged if he implicated himself. The recording corroborates the lack of such promises being made by Demery to Little. He reiterated this fact in his trial testimony.
Before denying Little’s motion to suppress, the trial court noted its in camera inspection of all three statements made by Little. As its reasons for denying the motion, the court specifically quoted portions of one of the |2iinterviews in which Demery specifically told Little that he could not promise him anything.
Little concedes, and the audio recordings confirm, that he was advised of Miranda rights before being questioned at each of the three interrogations. Nevertheless, Little contends that although Demery told him in the second interview that he could not promise him anything, threats and promises “came before the second interview was recorded and when the tape was turned off in the middle of the interview.”
We find no abuse of discretion in the trial court’s ruling. A review of the audio *1230 recordings reveals repeated instances of Demery advising Little that he is under- no threat or obligation to talk. There is no indication other than Little’s suggestions that there was any duress, threats or promises made by Demery in exchange for Little’s statements. In these circumstances, the trial court reasonably accepted Demery’s testimony that the statements were freely and voluntarily made by Little. This assignment of error is without merit.

Decree

For the foregoing reasons, Little’s conviction and sentence is affirmed.
AFFIRMED.

. In the five months following the incident, police had received information from an informant implicating three other individuals in the murder. A month after the shooting, Brown regained consciousness, but was still unable to speak. He was shown three photographic arrays and identified two of the men as the perpetrators. The men were initially charged with Crowder's murder.

. While the actual grand jury testimony is not contained in the record, Demery insinuated that Brown later recanted his identification and provided hostile and inconsistent testimony in front of the grand jury.

. Little was arrested at a home on Wilkinson Street in Shreveport where he and West were staying. When officers arrived, West verbally advised that Little was not there, but shook her head that he was present. Little had crawled into the attic space to hide and, when officers sent a canine unit in to search for him, he fell through the ceiling. The canine bit Little and officers were able to apprehend him. Little received medical attention and was then brought to the jail. He claimed to have been hiding from Demery because he was planning a burglary and had been convicted of burglary before.