BLEICH, J. (Pro Tempore )
This criminal appeal arises from the First Judicial District Court, Caddo Parish, State of Louisiana. The defendant, Randy Anderson, was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefits, pursuant to La. R.S. 14:30.1. This appeal by Anderson ensued, and for the following reasons, we affirm his conviction and sentence.
FACTS
On December 2, 2012, Timothy Anderson ("Timothy") was found dead in his mother's home at 3712 Dilg League, in Shreveport, Louisiana. He had been shot seven times: once to the top of the head, four times to the back, and twice to the abdomen. Shreveport police quickly suspected Timothy's brother, Randy Anderson ("Randy"), for the murder. The next day, Randy was apprehended by police after the car he was traveling in, which was owned by Sterling Ary, was stopped in Bossier City, Louisiana. Randy's guitar case was found in the backseat of the car. Inside the case, police found a 9mm handgun and a shirt with stains on it-suspected to be blood. Randy was arrested at that time.
The police investigation showed that Randy had purchased the gun several days before. Firearms testing confirmed that the shell casings found at the scene and the bullets recovered from Timothy's body were fired from the 9mm gun. Also, DNA analysis revealed that the blood on the shirt was consistent with Timothy's DNA. Randy was charged by a grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1.
Because Randy has paranoid schizophrenia, sanity evaluations were conducted, after which the trial court determined that Randy was not competent to proceed. He was placed in the Feliciana Forensic Facility. Thereafter, Randy was re-evaluated and three court-appointed doctors determined that he was competent to proceed and knew right from wrong at the time of the incident.
On November 16, 2016, following a three-day trial, the jury found Randy guilty as charged of second degree murder. The jury was polled, revealing a vote of 10-2. Randy filed a motion for post-verdict judgment of acquittal, arguing that the evidence was insufficient to support his conviction, which motion was denied. He then waived sentencing delays, and the trial court sentenced him to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal ensued.
DISCUSSION
Sufficiency of the Evidence
Randy's appeal counsel brings one assignment of error on appeal, arguing that the evidence introduced by the state at *644 trial to convict Randy of second degree murder was circumstantial in nature and not sufficient to negate every reasonable hypothesis of innocence. Randy contends that the evidence did not lead solely to the conclusion that he killed Timothy, and therefore, the state failed to prove he was guilty beyond a reasonable doubt. Specifically, Randy maintains there was no eyewitness to the shooting, and the circumstantial evidence did not exclude every reasonable hypothesis of innocence. Randy further argues that although he owned the gun, he is not the only person who could have fired it, and the shirt with blood on it could have ended up in Ary's car at any time. Finally, Randy submits he may have been trying to protect the real shooter, and it is possible that Ary shot Timothy. We disagree.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Sullivan , 51,180 (La. App. 2 Cir. 02/15/17), 216 So.3d 175. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford , 2005-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 01/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to the factfinder's decision to accept or reject the testimony of a witness in whole or in part. State v. Sullivan, supra .
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id .When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Lilly, supra ; State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 2012-2658 (La. 05/17/13), 117 So.3d 918.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Mickelson , 2012-2539 (La. 09/03/14), 149 So.3d 178 ; State v. Walker , 51,217 (La. App. 2 Cir. 05/17/17), 221 So.3d 951. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Lloyd , 48,914 (La. App. 2 Cir. 01/14/15), 161 So.3d 879, *645 writ denied , 2015-0307 (La. 11/30/15), 184 So.3d 33, cert. denied , --- U.S. ----, 137 S.Ct. 227, 196 L.Ed.2d 175 (2016). The determination of whether the requisite intent is present is a question for the trier of fact. Id. ; State v. Walker, supra .
At trial, the jury was presented with the following testimony and evidence. James Higdon, the manager of Lorant's Sporting Goods in Shreveport, testified that on November 1, 2012, Randy came into the store, picked out a Masterpiece Arms 9mm semi-automatic handgun, and completed the required forms to purchase the gun. On November 30, 2012, Randy completed the purchase and picked up the gun.
Martha Marshall, Randy's ex-girlfriend and the mother of his child, testified that Randy called her on December 2, 2012, the day of the murder, to come pick up money for child support. Martha went to Randy's house on Dilg League that afternoon, around 2:00 or 3:00 p.m. Randy met Martha in the driveway, gave her money and told her he had "found a way out," but did not explain what he meant. Martha testified that Randy's mother, Corrine Anderson, arrived at the house while she was there. After Martha left the house, Randy called her for a ride, but she was with a friend and refused. Martha testified that he continued to call her, about 16 times, but she only answered twice, and Randy asked for her sister's number. Later that night, Martha saw on the news that Timothy had been killed.
Corrine Anderson testified that Randy is her adopted son and Timothy is her biological son. Corrine's daughter, Lashondra, lives next door to her, and Timothy lived next door to her on the other side. Corrine testified that in December 2012, Randy and another son, Paul Anderson ("Paul"), lived with her at 3712 Dilg League. Paul has mental and physical disabilities and Lashondra and Timothy helped Corrine care for Paul.
At the trial, Corrine related that on the day of the murder she went to church and then returned home. At that time, Randy was at the house and Paul had just returned from Lashondra's house. Corrine testified that Randy was pacing and kept going out the front door. Corrine looked out and saw Martha next to a white car in the driveway. When Corrine went outside, Martha jumped in the car and left. Randy came inside, seemingly agitated, and mumbled to himself that Martha was coming for money. Corrine testified that he then left the house to go cash his check. A short time thereafter, between 2:30 and 3:00 p.m., Timothy came to Corrine's house after getting off work. Timothy and Paul were watching football in the den, and Timothy asked Corrine to go get a Christmas tree. Corrine left, and when she returned with the tree, she entered from a side door by the den. She noticed that Timothy's cell phone screen was broken, but she did not see Timothy or Paul. In the kitchen, Corrine saw that boxes of food had been knocked off the baker's rack, the food she had prepared for Timothy had not been eaten, and the tablecloth on the kitchen table was missing. She began looking for Timothy and finally went into Randy's bedroom. Corrine recalled she saw the missing tablecloth on the floor by the bed. The tablecloth was piled like a pyramid, the same way Randy had a habit of piling up his clothes. Corrine picked up the tablecloth and saw Timothy on the floor; he was unresponsive and had a bullet hole in his head.
Paul also testified and stated he was watching football with Timothy on the day Timothy was murdered. Paul noted that Randy took his phone, and he never got it back. Paul related hearing a noise that sounded like a gunshot, and he testified *646 after hearing the noise he went to his sister's house, but did not tell her anything. Paul also stated that he saw Randy in the bedroom after he heard the noise, but he did not see Randy shoot Timothy, nor did he see Randy with a gun. According to Paul's account, Randy then left the house to go to the store. However, Paul also stated that Randy was at the house when the police arrived. Paul was at his sister's house when his mother returned to the house.
Dr. Long Jin, an expert in forensic pathology, performed the autopsy on Timothy. Dr. Jin testified that Timothy had seven gunshot wounds : one to the top of his head, four to his back, and two to his abdomen. The trajectory of the wounds to his head and back indicated that Timothy was on the ground when those shots were fired. Dr. Jin recovered six bullets from Timothy's body.
Officer Sean Hinderberger was a homicide investigator for the Shreveport Police Department when Timothy was murdered. Officer Hinderberger testified that he responded to the scene at Dilg League, and upon arriving, everything looked to be in place-there was no evidence of a struggle. At the scene, Ofc. Hinderberger interviewed Corrine, Lashondra, and Paul, but noted that Paul was "obviously mentally challenged" and could not give much information. Officer Hinderberger testified that all of the information he obtained pointed to Randy as the suspect. The next day, Ofc. Hinderberger interviewed Martha and her sister, Raqual, and determined that Randy was likely with his friend, Sterling Ary. According to Ofc. Hinderberger, Ary and Randy were stopped by police in Bossier City.
Ary testified he was a close friend of Randy. On December 2, 2012, Ary was working at a local casino when Randy called him around 4:00 p.m. asking for a ride. Ary left work, and went to Randy's house on Dilg League. Randy came outside and told Ary that he needed a ride to a "state building," and Ary agreed to take him. Randy went back inside the house and returned with a guitar case, which he put in the trunk of Ary's car. Ary testified that they drove to Marshall, Texas, but then realized that state buildings are closed on Sundays. They drove back to Shreveport, went to Ary's house for a while, and then drove around looking for a shelter for Randy to stay. At some point, they drove by Dilg League and saw police cars at Randy's house; Randy asserted he did not know why the police were there, and he told Ary to keep going. Ary eventually found a friend who agreed to let them sleep at her apartment that night. The next morning, before the friend told them to leave, Ary saw a story on the news that someone had been shot at Randy's house.
Ary testified that they drove to a parking garage at his place of employment and hung out for a while. They were trying to find a place for Randy to stay-he told Ary he wanted to go to Beaumont, Texas. In the meantime, Ary got a call from a friend who asked if he was still with Randy. The friend told Ary to drop Randy off, but would not explain why. Because Randy denied knowing what was going on, Ary disregarded the advice from the caller. Another friend then called Ary and informed him that someone had been shot and the police were looking for Randy. Later that night, Ary and Randy went to Justin Quarter's house. Ary testified he told Quarter to call the police and tell them Ary and Randy would be driving around I-20 so they could stop him. When the police located them in Bossier City, Randy told Ary to "punch it," but Ary stopped the car, and Randy was arrested.
Officer Tracy Mendels, a crime scene investigator for the Shreveport Police Department, *647 testified that she took photos and collected evidence at the crime scene on Dilg League. According to Ofc. Mendels, the victim was lying face down on the floor in a bedroom between two twin beds. She noticed blood spatter on the dresser and the floor; a tablecloth soaked with blood, riddled with what appeared to be bullet holes; and, a black stocking cap with an apparent bullet hole, lying on the floor next to the victim. Five expended shell casings were found on the bed, the floor, and in the hallway. Officer Mendels testified that Corrine later found another shell casing in the kitchen, for a total of six shell casings found in the house.
Officer Mendels also took photos and collected evidence from Ary's vehicle. She testified that in the backseat of the car, there was a black guitar case with a 9mm gun sticking out of a pocket. The gun had a spot of suspected blood on it and a live round in the chamber, but the magazine, which was loaded with 10 bullets, was not seated in the gun. In the pocket with the gun, Ofc. Mendels found Randy's state identification card along with three expended shell casings. A shirt that appeared to have blood on it was inside the guitar case, along with a guitar. There was also an empty plastic gun box, labeled "Masterpiece Arms Defender" and a barrel extension in the backseat of the car. Officer Mendels testified she also recovered a cell phone which had blood all over it.
Greg Rudell, formerly a homicide detective for the Shreveport Police Department, testified that he was the lead detective on this case.[1] Rudell interviewed Corrine at the scene and testified she told him that Randy, Paul, and Timothy were at the house when she left. Rudell recounted his interviews with Martha and Raqual, which eventually resulted in Randy being stopped in Bossier with Ary, who was not a suspect in the murder. Further, Rudell stated that the shell casings found in the guitar case in Ary's car were the same brand and caliber as the shell casings found in the house.
Chris Davis, a firearms examiner at the North Louisiana Crime Lab, examined the 9mm Masterpiece Arms gun, and all of the bullets and casings found in this case. Davis determined that all of the casings recovered from the scene and from Ary's car were fired from the gun belonging to Randy. Also, five of the bullets recovered from the victim's body were fired from the gun. The sixth bullet, which was damaged, was not sufficient for him to determine whether it was fired from the gun, but it did have the same class characteristics, meaning it was fired from a gun with the same number of lands and grooves.
Bill Duncan, an investigator with the Caddo Parish District Attorney's Office, testified that he collected a DNA sample from Randy and took it to the crime lab.
Monnie Michalik, a forensic DNA analyst at the North Louisiana Crime Lab, testified that she conducted DNA testing on a swab of blood from the gun, a swab from the grip of the gun, and a swab of blood from the shirt. The swab of blood from the gun contained insufficient DNA to produce a valid profile. Michalik obtained a partial DNA profile from the swab from the grip of the gun, which was consistent with Randy's DNA. Further, she testified that the swab of blood from the shirt was consistent with Timothy's DNA.
Randy did not testify, and the defense presented no evidence.
*648 We find the evidence presented at trial was sufficient to support Randy's conviction for second degree murder. The fact that Timothy was shot seven times, including once to the top of the head, shows that the shooter had the specific intent to kill. Although circumstantial, the testimony and evidence was sufficient for the jury to conclude that Randy was the shooter.
The testimony established that Randy was at the Dilg League house at and around the time of the shooting. Although Corrine testified that Randy left the house before she left to go get a Christmas tree, Rudell testified that Corrine told him that Randy was at the house with Paul and Timothy when she left. Also, although Paul did not see the shooting, he testified that after he heard the gunshots, he saw Randy in the bedroom and then leave the house. Timothy's body was found in Randy's bedroom underneath the kitchen tablecloth, which was piled up in a pyramid, the unusual thing Randy usually did with his clothes.
Ary testified that when he picked Randy up from the house, he had his guitar case. Notably, Randy never returned to the house. When Randy was apprehended the next day, police found a 9mm gun, which he had purchased several days before, and a shirt with blood on it inside the guitar case. Ballistics testing showed that the shell casings found in the bedroom and the bullets recovered from Timothy's body were fired from Randy's 9mm gun. Further, Randy's DNA was found on the grip of the gun, and the blood on the shirt matched Timothy's DNA. Additionally, Randy instructed Ary to flee from police when the duo was being closed in upon.
Although Randy suggests that Ary shot Timothy, such a hypothesis of innocence is not reasonable as there is no evidence linking Ary to the shooting. The jury's decision to reject Randy's hypothesis of innocence was reasonable and based on rational credibility and evidentiary determinations, and it is improper on appeal to assess the credibility of witnesses or reweigh evidence.
Considering the evidence in a light most favorable to the prosecution, the evidence was sufficient for the jury to conclude beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of his brother, Timothy. This assignment of error is without merit.
Pro Se Assignments of Error
Randy also filed an untimely supplemental pro se brief, raising two assignments of error.
Randy's Mental Capacity
In his first pro se assignment of error, Randy asserts his rights provided by the Eighth Amendment to the United States Constitution against cruel and unusual punishment were violated where the trial court allowed him to proceed to trial without the trial court determining whether he had the capacity to understand the proceedings against him or to assist in his defense.
As previously noted, Randy has paranoid schizophrenia. On a motion by his defense counsel, the trial court appointed a sanity commission. On December 3, 2013, based on the opinions of Dr. Richard Williams and Dr. Marc Colon who examined Randy, the trial court determined that Randy was not competent to proceed to trial, and he was placed in the Feliciana Forensic Facility. Ultimately, it was concluded that Randy was able to understand the proceedings against him, and on November 5, 2014, the trial court ordered the doctors to re-evaluate Randy. The sanity hearing was held on May 31, 2016, at which Dr. Williams and Dr. Colon testified *649 that Randy was competent to proceed, and he knew right from wrong at the time of the offense. The trial court then ordered Dr. Mark Vigen to examine Randy. Dr. Vigen concluded that Randy had the capacity to understand the proceedings against him and could assist in his own defense. Based on the medical opinions, the trial court found that Randy was competent to proceed and set the matter for trial.[2]
In this assignment of error, Randy argues the trial court erred in relying solely on the conclusions of the doctors in making its legal determination he was competent to proceed to trial. He contends that the record contains sufficient evidence that he lacks the capacity to understand the proceedings against him or assist in his defense as he is a paranoid schizophrenic, bipolar, hyperactive, suffers from grandiose delusions, and takes numerous antipsychotic medications. Randy claims that the medical opinions, while relevant, were conclusory and incomplete. He notes in a February 17, 2015, report, Dr. Williams stated he needed to review more hospital records before he could determine whether Randy was able to distinguish between right and wrong at the time of the offense. Also, in an April 7, 2015, report, Dr. Colon found that Randy was likely operating under the presence of delusions at the time of the offense, but that there were not enough clinical indicators that he was unable to distinguish between right and wrong.
In order to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. La. C. Cr. P. art. 841(A).
The due process clause of the Fourteenth Amendment protects an individual's right not to proceed to trial while legally incompetent. State v. Odenbaugh , 2010-0268 (La. 12/06/11), 82 So.3d 215, cert. denied , 568 U.S. 829, 133 S.Ct. 410, 184 L.Ed.2d 51 (2012) ; State v. Taylor , 49,467 (La. App. 2 Cir. 01/14/15), 161 So.3d 963. Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense. La. C. Cr. P. art. 641.
Louisiana law presumes a defendant's sanity. La. R.S. 15:432 ; State v. Holmes , 2006-2988 (La. 12/02/08), 5 So.3d 42, cert. denied , 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Therefore, an accused bears the burden of proving by a preponderance of the evidence that he lacks the capacity to stand trial. Id. Although a trial court may receive expert medical testimony on the issue of a defendant's competency to proceed to trial, the ultimate decision of capacity rests with the trial court. La. C. Cr. P. art. 647 ; Holmes, supra . A reviewing court gives great weight to the trial court's determinations as to the defendant's competency, and the trial court's ruling thereon will not be disturbed on appeal absent an abuse of discretion. State v. Anderson , 2006-2987 (La. 09/09/08), 996 So.2d 973, cert. denied , 556 U.S. 1165, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009) ; Taylor, supra .
The Louisiana Supreme Court in State v. Bennett , 345 So.2d 1129, 1138 (La. 1977), provided the proper considerations to determine whether a defendant is fully aware of the nature of the proceedings against him, which include whether he: (1) understands the nature of the charge and can *650 appreciate its seriousness; (2) understands what defenses are available; (3) can distinguish a guilty plea from a not guilty plea and understand the consequences of each; (4) has an awareness of his legal rights; and, (5) understands the range of possible verdicts and the consequences of conviction.
The Bennett court also provided the following factors to consider when determining an accused's ability to assist in his defense, including whether a defendant: (1) is able to recall and relate facts pertaining to his actions and whereabouts at certain times; (2) is able to assist counsel in locating and examining relevant witnesses; (3) is able to maintain a consistent defense; (4) is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; (5) has the ability to make simple decisions in response to well-explained alternatives; (6) is capable of testifying in his own defense if necessary to defense strategy; and, (7) is apt to deteriorate mentally under the stress of trial. Id.
Here, although the defense did not object to the trial court's finding of competency, we conclude the trial court did not abuse its discretion in finding that Randy was competent to stand trial. The trial court was presented with the expert opinions of three doctors who found that Randy had the capacity to understand the proceedings against him and could assist in his own defense. At the sanity hearing, Dr. Williams and Dr. Colon testified that Randy understood his rights and the charges against him, could effectively participate in a trial, and could decide whether or not to testify. As to Randy's claim that the opinions of the doctors were incomplete, at the hearing, Dr. Williams testified that after he issued his report, he received the necessary records, which did not change his opinion that Randy was competent to proceed to trial and was able to distinguish between right and wrong at the time of the offense. Further, Dr. Williams and Dr. Colon testified that even though Randy was not compliant with his medications and had delusions at the time of the offense, the delusions did not relate to the offense, and therefore, Randy had the capacity to distinguish between right and wrong, and Randy's delusions would not impact his ability to consult with counsel during trial. The fact that Randy suffers from paranoid schizophrenia is not inconsistent with a finding that he was competent to stand trial. See State v. Jones , 376 So.2d 125 (La. 1979).
The trial court's determination of mental capacity is entitled to great weight, and the record does not support Randy's position that he lacked the capacity to understand the proceedings against him or to assist in his defense. Accordingly, this assignment of error is without merit.
Ineffective Assistance of Counsel
In his second pro se assignment of error, Randy asserts that his rights under the Sixth Amendment to the United States Constitution and the Louisiana Constitution to the assistance of counsel were violated where his trial counsel failed to prepare or adequately investigate the circumstances of his case. Randy argues that his attorney was ineffective by failing to undertake a reasonable investigation into the circumstances of this case when there was evidence that drugs may have been involved in the shooting, and in failing to investigate whether police obtained any evidence pointing to a different suspect. Randy notes that the case narrative section of the coroner's report states that according to the police, the victim was in the bedroom looking through things when Randy came in shouting at the victim and then pulled out his gun and began firing. Also, Randy notes that the coroner's report *651 states: "Causes of death: Several baggies of marijuana were found in the bedroom where the decedent was shot." He claims that the state's case against him was circumstantial and there was no evidence to corroborate any theory that Randy shot his brother over drugs.
Randy further claims that his attorney was ineffective by failing to obtain a firearms expert to rebut the state's claim that the shots were fired from his gun. He argues that Chris Davis, who testified as an expert in firearms identification in this case, was never certified as a firearms examiner or as a tool mark expert by the Association of Firearm and Tool Mark Examiners, and had only been accepted as an expert in firearms identification only twice.
Claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State v. Moore , 48,769 (La. App. 2 Cir. 02/26/14), 134 So.3d 1265, writ denied , 2014-0559 (La. 10/24/14), 151 So.3d 598 ; State v. Eiskina , 42,492 (La. App. 2 Cir. 09/19/07), 965 So.2d 1010. However, when the record is sufficient, allegations of ineffective assistance of trial counsel may be resolved on direct appeal in the interest of judicial economy. Id.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. State v. Wry , 591 So.2d 774 (La. App. 2 Cir. 1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
First, to establish that his attorney was ineffective, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that counsel's deficient performance prejudiced his defense and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra ; State v. Reese , 49,849 (La. App. 2 Cir. 05/20/15), 166 So.3d 1175, writ denied , 2015-1236 (La. 06/03/16), 192 So.3d 760.
A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Smith, 49,356 (La. App. 2 Cir. 11/19/14), 152 So.3d 218, writ denied , 2014-2695 (La. 10/23/15), 179 So.3d 597. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland, supra ; Reese, supra .
The filing and pursuit of pretrial motions is squarely within the ambit of the attorney's trial strategy, and counsel is not required to engage in efforts of futility. State v. Jones , 49,396 (La. App. 2 Cir. 11/19/14), 152 So.3d 235, writ denied , 2014-2631 (La. 09/25/15), 178 So.3d 565.
Randy's claims of ineffective assistance of counsel are without merit. First, there is no evidence that Randy's attorney failed to conduct an adequate investigation into the facts of this case. Other than the fact that marijuana was found in the bedroom where the victim was shot, there is nothing in the record indicating that the shooting was the result of an argument over marijuana. Further, at trial, the officers testified that all of the evidence pointed to Randy as the suspect, and there is no *652 evidence to suggest that another person shot the victim.
As to Randy's second claim that his attorney was ineffective in failing to retain a firearms expert, Randy merely complains that Chris Davis, the state's expert, was not qualified and does not state why independent testing should have been pursued. At trial, defense counsel objected to Davis' qualifications as a firearms examiner based on his lack of certifications and the fact that he had only testified on two prior occasions. The trial court overruled the objection. There is no indication that Davis' firearms testing in this case was incomplete or suspect in any way. Mere conclusory statements are insufficient to establish a claim of ineffective assistance of counsel. Randy failed to show that his attorney was deficient in failing to retain a firearms expert, or that additional firearms testing would have changed the outcome of his trial. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, Randy Anderson's conviction and sentence are affirmed.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, MOORE, GARRETT, STONE and BLEICH, JJ.
Rehearing denied.

At the time of the trial, Rudell was no longer employed by the Shreveport Police Department.

Previously, on March 3, 2015, the defense had filed a motion to change Randy's plea to not guilty and not guilty by reason of insanity. However, the defense withdrew that motion prior to trial based on the medical opinions.