Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,506-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

HERMANDUS DASHNSKI                          Appellant
SEMIEN

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. F-2020-223

Honorable Stephen Gayle Dean, Judge

* * * * *

LOUISIANA APPEALS &                  Counsel for Appellant
WRIT SERVICE
By: Sherry Watters

PENNY W. DOUCIERE                    Counsel for Appellee
District Attorney

KENNETH D. WHEELER
AMANDA M. WILKINS
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and COX, JJ.

**COX, J.**

This criminal appeal arises from the Fifth Judicial District Court, Franklin Parish, Louisiana. Hermandus Semien was convicted of one count of first degree murder (La. R.S. 14:30), one count of armed robbery (La. R.S. 14:64), one count of theft of a motor vehicle valued at $5,000 or more but less than $25,000 (La. R.S. 14:67.26), and one count of possession of a firearm by a convicted felon (La. R.S. 14:95.1). Semien was sentenced to life imprisonment without benefits for count one; 99 years for count two; 10 years for count three; and 20 years for count four. For the following reasons, Semien's convictions and sentences are affirmed.

## FACTS & PROCEDURAL HISTORY

As gleaned from the record, the following facts regarding Semien's convictions are as follows:

On October 17, 2020, as Langston Yancey ("Yancey") attempted to close his store, Yancey's Pharmacy, located in Rayville, Louisiana, a man, later identified as Semien, held him at gunpoint, took his iPad and cellphone, and forced him back into the store. Semien ordered Yancey to put several drugs, including Percocet, OxyContin, Promethazine, Oxycodone, and other narcotics into a black duffel bag. Semien then bound Yancey's wrists and ankles before he took the keys to Yancey's truck and fled. Once Yancey was able to free himself, he walked to the nursing home behind his store, noticed his truck was parked next to another white truck with a Slemco sign on it, and then called the police.[1]

_____

[1] The record indicates that Semien was inside Yancey's vehicle at this time before he eventually fled the scene.

During this time, Officer Marshall Waters ("Officer Waters") and reserve officer Charles Johnson ("Officer Johnson"), of the Mangham Police Department, were on traffic patrol when Officer Waters was informed that a suspect had fled on foot, following a robbery in Rayville. Several minutes later, the officers observed a white Ford truck speeding, and Officer Waters pursued and pulled the vehicle over. As Officer Waters exited his patrol unit, the driver of the truck, later identified as Semien, leaned out of the window and fired a single round that hit Officer Waters, who returned fire. Officer Waters radioed dispatch that he had been shot and that Semien fled the scene. Officer Waters later died from complications from the gunshot wound.

Investigator Jackie Gilbert ("Inv. Gilbert") of the Louisiana State Police was contacted to assist in the matter. After learning of the robbery and subsequent shooting, Franklin Parish deputies informed Inv. Gilbert that Yancey's stolen truck had been found in a ditch on Highway 562 in Fort Necessity, Louisiana. Resident Ray Wollerson ("Wollerson") informed officers that he witnessed the truck being backed into a ditch and went to assist the driver. When Wollerson approached the truck, he noticed that the driver was dressed in a dark hoodie, gloves, and had on a black bandana that covered most of his face. Wollerson noted that after the driver refused to look at or acknowledge him when asked if assistance was needed, he left the area and had his father contact the police because he believed the truck may have been stolen.

Wollerson reported that he saw the driver exit the vehicle and run toward an abandoned home. Officers patrolled the area and found and arrested Semien in a wooded area near the ditch where the truck was

2

abandoned. Officers also recovered a pistol that had been dropped into a pool of water Semien fell into when he fled, as well as a black duffle bag with the narcotics stolen from Yancey's Pharmacy, and a black backpack that contained duct tape, clothes, and various tools. Semien was then transported to Richland Parish Sheriff's Office, where he provided a recorded statement to officers.

During his interview, Semien confessed that he stole a truck from Slemco Electric, drove it to Yancey's Pharmacy, and stole narcotics from Yancey because he knew the store and thought it would be an easy place to rob. Semien admitted he stole Yancey's truck and fled and that he shot Officer Waters when he was pulled over for speeding. Semien indicated that he did not intend to kill Officer Waters but just wanted to get away and fired at his midsection because he thought Officer Waters had a vest on; however, Semien also stated that he fired a shot because it "was either him or me." Semien confessed that he fled the scene, but eventually got lost, attempted to turn around, and accidentally backed into a ditch, where he then ran into the woods until he heard orders from officers to get down. Semien admitted he continued to run, and when he fell into a small body of water, he pushed his pistol into the mud before he was arrested.

On December 4, 2020, Semien was indicted by a grand jury on four counts: (1) first degree murder of Officer Waters, in violation of La. R.S. 14:30; (2) armed robbery, in violation of La. R.S. 14:64; (3) theft of a motor vehicle, in violation of La. R.S. 14:67.26; and (4) possession of a firearm as a convicted felon, in violation of La. R.S. 14:95.1. The indictment was later amended to reflect the value of the vehicle (valued at $5,000 or more but less than $25,000) concerning count three. On February 5, 2021, the State

filed notice of intent to seek the death penalty for count one. On January 19, 2023, defense counsel filed a motion to appoint a sanity commission to evaluate Semien's competency to proceed to trial. On February 10, 2023, the trial court appointed Dr. Jesse Lambert ("Dr. Lambert") and Dr. Phillip Scurria ("Dr. Scurria") to the sanity commission to evaluate Semien.

Dr. Lambert determined that Semien was not competent to proceed to trial, opining that Semien "appeared to suffer from impairment in rational understanding secondary to a psychotic process," and Semien's "psychosis has compromised [his] ability to rational[ly] understand the proceedings and contemplate decisions rationally." In contrast, Dr. Scurria determined Semien was competent to stand trial, opining that Semien "has the ability to assist [in] his defense and provide information to his attorney appropriately," and did not believe Semien required inpatient psychiatric hospitalization. Due to conflicting opinions, the trial court appointed a third sanity doctor, Dr. Jennifer Russell ("Dr. Russell"), who found that Semien was not competent to proceed to trial.

On May 31, 2023, reports from each doctor were submitted to the trial court in lieu of live testimony at the sanity hearing. On June 28, 2023, the trial court ruled that Semien, at that time, was not competent to assist his counsel or to proceed to trial. The trial court ordered Semien to receive treatment under the custody of Eastern Louisiana Medical Mental Health System ("ELMS"). Prior to Semien's transfer, the State submitted an incident report from Richland Parish Detention Center which documented that on July 1, 2023, Semien stated, in part, that he "killed a cop before I will do it again," and in reference to Captain Waymon Shaw ("Cpt. Shaw"), stated, "I ain't afraid to kill his a***."

4

On May 2, 2024, a second sanity hearing was held wherein the following pertinent testimony was adduced:

First, Cpt. Shaw testified he was employed at Richland Parish Detention Center, where he interacted with Semien weekly. Cpt. Shaw stated that from his perspective, he did not observe any behavior or hear any statements from Semien that would lead him to believe that Semien either had a mental disorder or that he did not understand his own actions. Cpt. Shaw noted that Semien could check out books from the library, fill out an incident report following an altercation with another inmate, and check out tablets or iPads, which Semien used to send text messages. On cross-examination, Cpt. Shaw denied hearing any statements that Semien believed his death would "enlighten the youth or create worldwide global change for the youth."

Next, Dr. E. John Roberts, III ("Dr. Roberts"), tendered as an expert in the field of forensic psychiatry and general psychiatry, testified that Semien received treatment at ELMS for about three months. Dr. Roberts stated that during an initial evaluation, Semien did not exhibit behaviors that indicated he had a mental illness and noted there was no evidence that Semien had a diagnosable mental condition, intellectual disability, major psychiatric diagnosis, neurocognitive impairment, or memory impairment.

Dr. Roberts further noted that Semien denied any auditory or visual hallucinations and denied that he had any suicidal or homicidal ideations and did not need any medications during that time. Dr. Roberts testified Semien was able to provide his social, educational, employment, and medical history on his own and could interact with staff and engage in a normal pattern of behavior with other patients. Further, Dr. Roberts stated Semien presented

5

no indications of hyper-religiosity, which would have impeded his judgment, and instead, noted Semien had fairly good judgment and had no difficulties with impulse control.

Dr. Roberts testified that, based on Semien's report generated from biweekly and weekly staffing evaluations, Semien met the *Bennett* criteria[2] for competency to assist his counsel and to proceed to trial. Specifically, Dr. Roberts stated Semien could articulate the charges against him, that he understood the consequences he faced if convicted, could distinguish between a guilty plea and a non-guilty plea, and understood the range of verdicts involved in his case.

On cross-examination, Dr. Roberts agreed that to be competent, Semien needed both a factual and rational understanding of the charges against him, which he believed was present in this case. He also agreed that there was no indication Semien appeared to fake a mental illness but stated that he engaged in symptom exaggeration. Dr. Roberts also acknowledged that Semien was diagnosed with major depressive disorder with an episode of severe psychosis when he was 11 years old and was admitted to

---

[2] *See*, *State v. Bennett*, 345 So. 2d 1129 (La. 1977), in which the Louisiana Supreme Court provided that the proper considerations to determine whether a defendant is fully aware of the nature of the proceedings against him, include whether he: (1) understands the nature of the charge and can appreciate its seriousness; (2) understands what defenses are available; (3) can distinguish a guilty plea from a not guilty plea and understand the consequences of each; (4) has an awareness of his legal rights; and, (5) understands the range of possible verdicts and the consequences of conviction.

The *Bennett* court also provided the following factors for courts to consider when determining an accused's ability to assist in his defense, including whether a defendant: (1) is able to recall and relate facts pertaining to his actions and whereabouts at certain times; (2) is able to assist counsel in locating and examining relevant witnesses; (3) is able to maintain a consistent defense; (4) is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; (5) has the ability to make simple decisions in response to well explained alternatives; (6) is capable of testifying in his own defense if necessary to defense strategy; and, (7) is apt to deteriorate in his mental capacity under the stress of trial.

Brentwood with suicidal, homicidal, and auditory and visual hallucinations in 2009; however, he also testified that because he did not diagnose Semien at that time it was also possible that he was misdiagnosed depending on the tests administered at that time.

On redirect, Dr. Roberts testified that a person's religious beliefs, including Semien's, did not necessarily equate to irrational decision-making or impede his ability to competently proceed to trial. Dr. Roberts opined that in this case, there was nothing that led him to believe that Semien was not competent to stand trial.

Next, Dr. Scurria, tendered as an expert in general psychiatry, testified that he evaluated Semien on two different occasions and determined that Semien met the *Bennett* criteria and was competent to assist counsel and proceed to trial. Specifically, Dr. Scurria stated that he was aware of Semien's religious ties to the group known as the Five Percent Nation and when discussing his beliefs, Semien tended to go off on tangents but ultimately could be brought back to the original question. Dr. Scurria testified that Semien's beliefs did not render him irrational or unable to assist his counsel, as Semien was able to recall facts of his case and could understand the consequences of the charges against him. Dr. Scurria testified that he did not find any evidence of psychosis and found that Semien often rambled when speaking about his beliefs because the religion's doctrine is not recorded but passed along verbally. Dr. Roberts concluded that these beliefs did not impinge on Semien's rationality or understanding of the legal proceedings.

On cross-examination, Dr. Scurria testified that Semien did not meet the criteria for mania but admitted that Semien reported seeing "signs" and

auras from other people, that he believed he was anointed by God, and that Semien reported he did not want to take a plea because he thought it would be like working with Satan. However, Dr. Scurria noted that he believed Semien simply likened the district attorney's office to Satan because many people believe that the government takes advantage of people. Dr. Scurria did admit that he should have but did not ask further questions concerning Semien's belief that his death would "benefit the collective." Dr. Scurria maintained, however, that as of his last evaluation with Semien, he satisfied the *Bennett* criteria and could assist counsel at trial.

Dr. Lambert, an expert in the field of clinical forensic psychology and a medical psychologist, determined Semien was not competent to assist counsel or proceed to trial. Dr. Lambert testified that he reviewed both Dr. Scurria and Dr. Roberts' reports as well as Semien's other medical records from ELMS and other treatment facilities where he had been treated previously. Dr. Lambert testified that he administered a clinical interview with Semien for about an hour and a half and then administered assessment techniques to evaluate psychological-psychiatric functions and tests to determine if Semien feigned his reported symptoms or cognitive impairment. Dr. Lambert stated that he saw no indication that Semien was malingering mental health, which is the intentional feigning or exaggeration of psychological symptoms.

Dr. Lambert opined that Semien appeared to have "well-defined, very specific, grandiose delusions in the form of hyper religiosity," which led him to believe that the most appropriate diagnosis for Semien would be delusional disorder. Dr. Lambert stated this diagnosis was supported by Semien's conviction of his beliefs, which he believed entered the realm of

delusion, such as Semien's belief that upon his death, "black youth will automatically be treated fairly and they will be recognized[.]" Moreover, Dr. Lambert stated that Semien conveyed atypical sensory experiences, in which Semien claimed he played chess with Jesus, and alluded that he (Semien) was the only person who could facilitate equality, which Dr. Lambert characterized as a fixed delusion. Dr. Lambert opined that this pattern of thinking prevents Semien from rationally understanding the nature of his charges and other legal proceedings, such as plea negotiations.

On cross-examination, Dr. Lambert admitted that his original interview with Semien was approximately one and a half hours, that he interviewed Semien again a few days before the hearing, and that the interview lasted 30 minutes. He also acknowledged that Semien was evaluated and monitored for three months at ELMS. Dr. Lambert also agreed that Semien can factually understand the nature of the charges against him, can recall pertinent facts to his case, can assist counsel in locating and examining relevant witnesses, and understands the difference between a guilty and not guilty plea.

Dr. Lambert further acknowledged that Semien was found competent to enter guilty pleas in at least two prior felony charges and still held the same religious beliefs during those proceedings. Dr. Lambert also admitted that Semien denied having any mental health symptoms, and that upon testing, denied that Semien presented symptoms of schizophrenia or bipolar disorder. On redirect, Dr. Lambert maintained that he did not believe Semien could rationally make an autonomous decision to plead guilty or not guilty.

9

Finally, Dr. Russell, an expert in clinical and forensic psychology, testified that she also reviewed all previous medical records and reports in addition to her own testing. Dr. Russell stated that after her evaluation, she determined Semien suffered from a "delusional disorder of a mixed type." Dr. Russell stated that, in her opinion, Semien's religious beliefs are delusional because Semien referred to himself as a "seer" who can see the future, which he believed was linked to his current legal situation. Dr. Russell also noted that Semien has a fixed delusion with the number 4, and that he looks for "signs" related to the number to confirm his actions. She stated that not all delusions impact other areas of a person's life so that their functioning would not be impaired in moments unrelated to that delusion.

Dr. Russell stated that Semien's rationale in determining whether he should take a specific plea would become illogical, and he could not rationally make a decision in this regard. On cross-examination, Dr. Russell testified that Semien could, however, listen to facts, hear evidence, and confer with counsel about those facts and evidence, but questioned his ability to do so rationally.

Following the close of testimony, the trial court issued its written ruling on May 8, 2024, in which it determined Semien was competent to proceed to trial. The trial court explained, in part:

> The Court has carefully reviewed the evidence presented at this competency hearing, which include[s] the reports and testimony of these experts, and has studied cases in which other courts have considered the competency of a defendant under *Bennett* criteria. The Court recognizes the defendant's stated position regarding possible plea bargains may naturally cause concerns to defense counsel and may seem irrational to others. However, the fact remains that the defendant has clearly demonstrated his ability to make rational decisions in the past in connection with his defense in this case. He has admittedly demonstrated to each of the experts an understanding of the nature of the

10

proceedings and has in the Court's opinion also demonstrated the ability to assist counsel to a large degree.

The fact that the defendant might supposedly not agree to consider any plea agreement at this stage of the proceedings does not necessarily lead to the conclusion that he would never consider a plea agreement, even if it means he will face the death penalty. The defendant's statements in this regard do not establish in the Court's mind that defendant is either delusional or unable to assist counsel to the extent required under *Bennett* criteria. Based on the testimony received by the Court from all four experts, the factors expressed by Dr. Lambert (defendant will be "recognized for who he is"; "black youth will be treated fairly automatically" should he be put to death; defendant "has no choice in these matters"; and "if he doesn't obey, he will be damned to hell") in reaching his diagnosis of delusional disorder are statements by the defendant that are all either within the tenets of the "5% Nation" religious beliefs or at the very least on the spectrum of those beliefs, according to the testimony received by the Court. The same can be said for the factors expressed by Dr. Russell (defendant believes be cannot be put to death or that he at least inferred that; he will overthrow Napoleonic law through this case; My message will have global reach and this case will help accomplish that; he is a seer and an elite in the "5%"; and the outcome of the case has been predetermined) as reasons for her diagnosis of delusional disorder. While these admittedly are considered to be extreme beliefs (if they are truly so held by defendant), they do not in the Court's opinion automatically lead to or necessitate a finding by the Court that the defendant is delusional to the point that he is not competent to stand trial or assist counsel in his defense within the contemplation of *Bennett* or cases decided thereunder.

The defense presented no evidence to the Court that would show that defendant's acceptance of and adherence to the recognized religious beliefs of the "5% Nation" as described in the testimony and reports of the four experts would prevent the defendant from assisting his counsel by making simple decisions to well-explained alternatives or cooperating with his counsel in considering and making a simple decision relating to a possible plea agreement in the future. As is abundantly clear, it is well within the defendant's power to change his position regarding a possible plea agreement as the case progresses toward trial. Indeed, if the defendant were to be convicted as charged, the imposition of the death penalty by the jury is obviously not a foregone and inevitable conclusion, even should the defendant wish this to be so or somehow attempt to cajole or threaten the jury into imposing the death penalty.

In order to fulfill its obligation to reach its own conclusion regarding the competency of the defendant, the Court has carefully reviewed the testimony of the experts who testified, studied the experts' reports admitted into the record, and made particular note of the detailed descriptions of the defendant's behavior and level of cooperation during, and responses provided as part of his interviews with and testing by the experts and associated staff. The Court has also observed the defendant during the several court proceedings in which he has appeared before the Court, most especially the subject competency hearing. The defendant has demonstrated an appropriate presentation during his time in court, has appeared attentive overall, has apparently followed the in-court proceedings with interest and understanding, has listened to the various witnesses and consulted quietly with his counsel in-court on occasion. None of the defendant's actions have evidenced that he does not understand the proceedings or is unable to assist his counsel in all aspects required under *Bennett*. Based on the totality of reported interactions by the defendant with the experts and associated staff, their recorded detailed observations and testimony, and the Court's personal observations of the defendant the Court believes that the defendant has clearly demonstrated that he possesses the capacity to both understand the proceedings against him and assist in his defense within the requirements of the applicable caselaw and statutory framework.

On May 31, 2024, defense counsel filed a notice of intent to seek writs concerning the trial court's ruling as to competency. Following an offer with the State to not seek the death penalty, defense counsel stipulated on the record, in pertinent part, to the following: (1) to withdraw the writ application to review the trial court's ruling as to competency, (2) to not enter a plea of not guilty by reason of insanity, and that (3) issues concerning Semien's mental health would not be raised at trial, and no expert would be called in that regard.

Jury trial began on September 23, 2024, and two days later, the jury returned a unanimous guilty verdict on all counts. On October 4, 2024, the trial court sentenced Semien, as to count one, to life imprisonment without benefits. Semien returned to court on January 29, 2025, for sentencing on

12

the remaining convictions. The trial court reviewed Semien's presentence investigations report ("PSI") and sentenced Semien to 99 years for count two, 10 years at hard labor for count three, and 20 years without benefit of parole for count four.

## DISCUSSION

On appeal, Semien argues that the trial court erred in determining he was competent to stand trial.

Specifically, Semien argues that Dr. Lambert and Dr. Russell testified that he (Semien) was diagnosed with delusional disorder, which interfered with his decision-making and rationality and was, therefore, not capable of assisting counsel and could not proceed to trial. Semien highlights Dr. Lambert's testimony that his (Semien's) fixed delusions concerning death and martyrdom not only prevented him (Semien) from testifying and considering plea offers but were also inconsistent with rational decision-making during trial proceedings. Likewise, Dr. Russell also agreed that these delusions prevented rational decision-making.

Although Dr. Scurria and Dr. Roberts determined that Semien's religious beliefs did not equate to irrational decision-making or diminish his understanding of the nature of the proceedings, Semien argues that "this case is not decided by the quandary of two experts finding [he] was competent with the other two [experts] finding that he was not. This case is not decided by the differences in the disciplines of the experts who evaluated [him]." Instead, Semien argues that the trial court should have looked at the quality of the evaluations and support for the conclusions of each expert. In this case, Semien argues that Dr. Lambert and Dr. Russell, "after over a year of conducting detailed evaluations" and "researching the [Five Percent]

13

Nation," concluded that his delusions exceeded the group's tenets and were exacerbated by his delusional disorder, and their evaluations should have been afforded greater weight.

Before addressing the crux of Semien's arguments, this Court first highlights that after the trial court issued its ruling on Semien's competency, defense counsel filed a notice of intent to seek writs. However, defense counsel entered into a pretrial agreement with the State in which the State agreed not to seek the death penalty, and defense counsel agreed to waive all arguments of competency at trial and withdrew its notice of intent to seek writs on the trial court's ruling. In accordance with that agreement, the issue of competency was not raised, and no expert witnesses testified on the matter. In brief, Semien acknowledges this pretrial agreement and waiver but argues in a footnote that the waiver as to competency was limited to the trial court only, and he did not waive his objection or the right to appeal the ruling. We disagree.

Generally, to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. *State v. Mays*, 54,251 (La. App. 2 Cir. 5/25/22), 338 So. 3d 1279, *writ denied*, 22-01000 (La. 10/4/22), 347 So. 3d 895. If no objection is made in the trial court, any error committed therein is not preserved for appellate review. *Id*. While defense counsel in this case lodged an objection to the trial court's ruling, an agreement was nevertheless entered into in which Semien agreed to waive issues related to competency in exchange for a more favorable sentence, i.e., life imprisonment rather than the death penalty.

The terms and stipulations of that agreement were put on the record as follows:

> The State and Defense have also reached the following agreements:
>
> 1. State and Defense will stipulate that the victim Marshall Waters was a Peace Officer as defined by R.S. 14:30 (B)(1) and he was working in the course and scope of his duties as a peace officer at the time he was killed.
>
> 2. State and Defense will stipulate to the authenticity and admissibility of the medical records of Rapides Medical Center/Dr. Samantha Zeringue.
>
> **3. In response to the State's Motion for Discovery and Inspection, the defense has no expert witness or expert witnesses that it intends to call at the trial in this case.**
>
> **4. The defense is withdrawing the writ for review of the trial court's ruling on the issue of competency.**
>
> **5. The defense has not entered a plea of Not Guilty by Reason of Insanity and understands and agrees that evidence of mental health or mental illness is not admissible at trial.**
>
> 6. The defense will stipulate that the defendant has a prior felony conviction of simple burglary in 2014 and a prior conviction for aggravated second degree battery in 2016 in support of the possession of a firearm by a convicted felon.
>
> 7. The defense will be ready for the trial on September 23, 2024, and you will remain counsel of record through the completion of this trial. If the information contained herein is correct, please confirm by signing below and returning to my office. (Emphasis added.)

There is no indication within the record that this agreement was predicated upon a conditional waiver of the issue of competency being limited to the trial court. Defense counsel used the issue of competency to negotiate the agreement for the State to not seek the death penalty, and as part of trial strategy, was satisfied that Semien was competent to proceed to trial once the agreement was made.

15

The State did not repudiate its agreement not to seek the death penalty; and, in turn, Semien, as a matter of policy, should not be permitted to renege on his reciprocal promise to refrain from raising the issue of competency once he obtained a more favorable outcome toward sentencing. Once the agreement was entered into, any prior objections to the trial court's ruling were waived. It is well established that for purposes of appeal, arguments are limited to those grounds raised at trial. *State v. Tabb*, 55,514 (La. App. 2 Cir. 4/10/24), 383 So. 3d 1066. Semien stipulated that the issue of competency would not be raised at trial, which waived his prior objection to the trial court's ruling, and he lost the right to present the issue on appeal.

However, even if Semien had properly preserved this claim for appeal, we find that this assignment of error still lacks merit.

The Fourteenth Amendment's Due Process Clause protects an individual's right not to proceed to trial while legally incompetent. *State v. Odenbaugh*, 10-0268 (La. 12/6/11), 82 So. 3d 215, *cert. denied*, 568 U.S. 829, 133 S. Ct. 410, 184 L. Ed. 2d 51 (2012); *State v. Taylor*, 49,467 (La. App. 2 Cir. 1/14/15), 161 So. 3d 963.

Louisiana C. Cr. P. art. 641 provides: "Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." Louisiana C. Cr. P. art. 643 provides: "The court shall order a mental examination of the defendant when it has reasonable grounds to doubt the defendant's mental capacity to proceed." Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the

16

proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. *State v. Campbell*, 06-0286 (La. 5/21/08), 983 So. 2d 810, *cert. denied*, 555 U.S. 1040, 129 S. Ct. 607, 172 L. Ed. 2d 471 (2008); *State v. Crossley*, 48,149 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, *writ denied*, 13-1798 (La. 2/14/14), 132 So. 3d 410.

Louisiana law presumes a defendant's sanity. La. R.S. 15:432; *State v. Holmes*, 06-2988 (La. 12/2/08), 5 So. 3d 42, *cert. denied*, 558 U.S. 932, 130 S. Ct. 70, 175 L. Ed. 2d 233 (2009); *State v. Anderson*, 51,603 (La. App. 2 Cir. 9/27/17), 244 So. 3d 640, *writ denied*, 17-1913 (La. 6/1/18), 243 So. 3d 1062. Therefore, an accused bears the burden of proving by a preponderance of the evidence that he lacks the capacity to stand trial. *State v. Holmes*, *supra*; *State v. Taylor*, 49,467 (La. App. 2 Cir. 1/14/15), 161 So. 3d 963.

Although a trial court may receive expert medical testimony on the issue of a defendant's competency to proceed to trial, the ultimate decision of capacity rests alone with the trial court. La. C. Cr. P. art. 647; *State v. Holmes*, *supra*; *State v. Anderson*, *supra*. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent an abuse of discretion. *State v. Anderson*, 06-2987 (La. 9/9/08), 996 So. 2d 973, *cert. denied*, 556 U.S. 1165, 129 S. Ct. 1906, 173 L. Ed. 2d 1057 (2009).

The record in this case reflects that the trial court carefully considered the issue of Semien's capacity when the issue was raised. When the initial sanity commission, comprising of Dr. Scurria and Dr. Lambert, arrived at split opinions concerning Semien's competency, the trial court appointed a

17

third expert on the matter, Dr. Russell, who found that Semien was not competent to proceed to trial. In accordance with Dr. Lambert's and Dr. Scurria's opinions, the trial court determined that Semien lacked the ability to assist counsel and ordered Semien to receive treatment at ELMS. Following that treatment, a second sanity hearing was held, in which Dr. Roberts, Semien's treating physician the entire time he was treated at ELMS, disagreed with Dr. Lambert's and Dr. Russell's opinion that Semien's religious beliefs were delusion.

Dr. Roberts and Dr. Scurria agreed that Semien was able to recall pertinent facts of his case, understood the charges against him, understood the range of potential verdicts he could receive, could work with his attorney to call witnesses, and could distinguish between a guilty plea and a not guilty plea. In contrast, Dr. Lambert and Dr. Russell maintained the opinion that Semien's beliefs, namely that Semien's opinions on martyrdom and a willingness to accept the death penalty for a greater purpose, among other sentiments, were indicative of irrational decision-making and interfered with his ability to understand the court process. Both Dr. Lambert and Dr. Russell diagnosed Semien with delusional disorder.

The trial court was presented with detailed testimony and evidence from all four experts who evaluated Semien's condition and behavior and researched his religious beliefs. Each of the four experts was extensively questioned about Semien's competency, and each presented medical conclusions based on their observations and testing. Moreover, the trial court also observed Semien's behavior and demeanor in court throughout the entire process and determined that he was competent to assist counsel and proceed to trial.

Although the experts in this case were divided concerning Semien's ability to competently proceed to trial and assist counsel, given the record, we cannot say that the trial court's ruling, which is afforded great weight, was an abuse of its discretion.

**Error Patent**

Semien has also requested that this Court review the record for any errors patent. In accordance with La. C. Cr. P. art. 920, all appeals are reviewed for errors patent on the face of the record. Following our review, no errors patent were found.

## CONCLUSION

For the foregoing reasons, the trial court's ruling, and Semien's convictions and sentences are affirmed.

**AFFIRMED.**